STATE of Wisconsin, Plaintiff-Respondent,

v.

Debra Ann HEAD, Defendant-Appellant-Petitioner.

Supreme Court

*No. 99–3071–CR. Oral argument October 4, 2001.—Decided July 11, 2002.*

2002 WI 99

(Also reported in 648 N.W.2d 413.)

195

For the defendant-appellant-petitioner there were briefs by *John D. Hyland, Marcus J. Berghahn* and

*Hurley, Burish & Milliken, S.C.,* Madison, and oral argument by *John D. Hyland.*

For the plaintiff-respondent the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

An amicus curiae brief was filed by *Katherine R. Kruse, Walter J. Dickey* and the *Frank Remington Center, University of Wisconsin Law School,* Madison, on behalf of the Frank J. Remington Center.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals[1] which affirmed a judgment of the Rock County Circuit Court. The petitioner, Debra Head (Debra), was convicted by a jury of first-degree intentional homicide for shooting and killing her husband, Harold Head (Harold). She claimed that she had acted in self-defense. To support her assertion, Debra attempted to introduce evidence of Harold's alleged threats and acts of violence towards her in the past, as well as her knowledge of Harold's threats and acts of violence towards others. She argued that these incidents explained her mental state at the time of the shooting and justified her theory of self-defense.

¶ 2. After Debra made an offer of proof, Circuit Judge Richard T. Werner denied her motion to introduce most of the proffered evidence, finding that the evidence did not provide a sufficient factual basis to support a self-defense theory. The court ruled that Debra was required to make a threshold showing that, viewed objectively, she had a "reasonable belief that she was preventing or terminating an unlawful interfer-

---

[1] *State v. Head,* 2000 WI App 275, 240 Wis. 2d 162, 622 N.W.2d 9.

ence with her person or actually believed that . . . the force used was necessary . . . to prevent imminent death or great bodily harm to her." The court determined that Debra had not made such a showing and excluded evidence of Harold's abuse of Debra in the past and of her knowledge of Harold's violent acts towards others. The court also denied Debra's request that it instruct the jury as to both: (1) perfect self-defense, which gives the jury a basis to find a defendant not guilty; and (2) imperfect self-defense, which permits the jury to find guilt on the lesser charge of second-degree intentional homicide.

¶ 3. The court of appeals affirmed Debra's conviction, and this court accepted her petition for review. At issue in this appeal are the standards for raising perfect self-defense as a complete affirmative defense to a charge of first-degree intentional homicide, and imperfect self-defense (unnecessary defensive force) to mitigate that charge. This case requires us to examine the standards governing the admission of evidence of a victim's violent character and prior acts of violence, and the standards for jury instructions on self-defense.

¶ 4. First, we hold that a defendant seeking a jury instruction on perfect self-defense to a charge of first-degree intentional homicide must satisfy an objective threshold showing that she *reasonably* believed that she was preventing or terminating an unlawful interference with her person and *reasonably* believed that the force she used was necessary to prevent imminent death or great bodily harm.[2] A defendant is entitled to an instruction on perfect self-defense when the trial

_____

[2] We use female pronouns throughout this opinion to avoid the wordy repetition of phrases such as "he or she" in a case involving a female defendant.

206

evidence places self-defense in issue. Perfect self-defense is placed in issue when, under a reasonable view of the trial evidence, a jury could conclude that the state has failed to meet its burden to disprove one of the elements of self-defense beyond a reasonable doubt. We make no judgment whether Debra Head was entitled to an instruction on perfect self-defense in this case. We defer to the circuit court, which will hear the case on remand, to apply the correct standards for a self-defense instruction based upon evidence presented at trial.

¶ 5. Second, we hold that a defendant seeking a jury instruction on unnecessary defensive force (imperfect self-defense) to a charge of first-degree intentional homicide is *not* required to satisfy an objective threshold showing that she was acting under a reasonable belief that she was in imminent danger of death or great bodily harm or that the force she used was necessary to defend herself. Rather, the defendant must show some evidence that she *actually* believed that she was in imminent danger of death or great bodily harm and *actually* believed that the force she used was necessary to defend herself. A defendant is entitled to an instruction on unnecessary defensive force when the trial evidence places this mitigation defense in issue. Unnecessary defensive force is placed in issue when, under a reasonable view of the trial evidence, a jury could conclude that the state has failed to meet its burden to disprove either that the defendant *actually* believed she was in danger of imminent death or great bodily harm or that she *actually* believed the force she used was necessary to defend herself, even if both beliefs were unreasonable.

¶ 6. Third, we hold that a defendant who claims self-defense to a charge of first-degree intentional ho-

micide may use evidence of a victim's violent character and past acts of violence to show a satisfactory factual basis that she *actually* believed she was in imminent danger of death or great bodily harm and *actually* believed that the force used was necessary to defend herself, even if both beliefs were unreasonable.

¶ 7. We conclude in this case that Debra's offer of proof established a sufficient factual basis for a claim of unnecessary defensive force (imperfect self-defense) and that she should have been allowed to present evidence of Harold's violent character and past acts of violence at trial in an effort to mitigate the charge of first-degree intentional homicide. Moreover, she was entitled to a jury instruction on second-degree intentional homicide on the basis of the evidence that was introduced at trial. Because evidence that should have been admitted was excluded and because an instruction that should have been given was denied, we conclude that Debra Head is entitled to a new trial. Accordingly, we reverse the decision of the court of appeals and remand this case to the circuit court.

¶ 8. Finally, we conclude that Wis JI—Criminal 1014, the jury instruction involving the mitigation of first-degree intentional homicide to second-degree intentional homicide based on unnecessary defensive force, does not accurately reflect the law as set forth in this opinion. We therefore request that the Wisconsin Criminal Jury Instructions Committee revisit and amend Wis JI—Criminal 1014 and other relevant instructions in accordance with this opinion.

## I. FACTUAL BACKGROUND

¶ 9. Our objective in this opinion is *not* to determine whether the State adduced sufficient evidence to sustain Debra Head's conviction for first-degree inten-

tional homicide. Our objective is to determine whether the defendant offered a sufficient factual basis for self-defense, so that the court was required to admit some of her proffered evidence at trial and required to permit some or all of her theory of the case to go to the jury. Consequently, for purposes of this appeal, we present the defendant's proffered evidence and trial testimony in the light most favorable to the defendant and acknowledge that this one-sided perspective of events does not represent the full story.

¶ 10. Debra Head was convicted of first-degree intentional homicide for shooting and killing her husband Harold on May 29, 1998, at their home in the Town of Johnstown in Rock County. The Heads had been married for 22 years and had two daughters.

¶ 11. In late January 1998 the Heads' 17–year-old daughter Brenda informed her mother that she was pregnant and that 21–year-old Chad Graves was the father of her unborn child. On Valentine's Day weekend, Debra and Brenda told Harold about the pregnancy, and he became enraged. He went into the bedroom he shared with Debra. He came out with two guns, stormed out of the house, and drove off to look for Graves, squealing his tires in the driveway. Harold threatened to kill Graves if he found him. He returned home later that night with his mother and brother, who had taken away his guns as well as a billy club that Harold kept in his vehicle.

¶ 12. Over the next several months, Harold continued to make threats against Graves, once claiming that if he encountered Graves, "he's dead; they'll pick him up in a body bag." Debra tried to avoid talk of their daughter's pregnancy because the mere mention of Graves' name would set Harold off. "It was like you lit the fuse of a bomb," she said.

¶ 13. On the evening of May 28, 1998, Debra and Harold argued about their finances. The argument was not heated.

¶ 14. The next morning, May 29, Debra overslept. Knowing that she would be late for work, she decided to stay home and talk to Harold again about their finances and apologize for not telling him the truth about not paying certain overdue bills. She testified that she had lied to her husband because she was afraid of his reaction. Harold was asleep, lying on his left side, on the half of the bed closest to the bedroom door. When Debra woke Harold by shaking his foot, he rolled over on his back and then to his right side, to face her. She was standing next to the bed, at his feet. Debra asked Harold if he were still upset about the events of the previous night. He said that he was. The two went on to discuss and work out some of the problems with their finances.

¶ 15. Debra then turned the conversation towards Brenda and Graves. This upset Harold, who began yelling that Graves had ruined his life and ruined Brenda's life. Debra tried to reason with Harold, telling him that he was mistaken, that he would have to come around, that he could not disown his daughter and refuse to accept Graves or his unborn grandchild. Harold became angry and said: "It's been all your fault ever since. Your fault Brenda got pregnant. It's your fault that this all happened." He continued, "Fuck Chad and fuck you, too. I'm sick of it." Then he said: "Maybe I should just take care of you guys and get on with my life." Debra understood this to be a threat, that Harold thought of her the same as he thought of Graves. She thought Harold was going to kill her and then kill Graves.

¶ 16. Debra testified that Harold clenched his fists, threw back the covers, and rolled across the bed "like he was going to reach for something." Debra knew that Harold kept a handgun under his side of the bed—the side on which she was now standing. She grabbed the gun, knowing that "that's what he was going for."

¶ 17. Debra was afraid. "Harold made the first move like he was coming after me, and I reacted to protect myself." She pointed the gun at her husband. They spoke briefly, with Debra telling him that he was wrong in the way he was thinking about Brenda and Chad.

¶ 18. Harold, 43, was a big man, 6 feet tall, 278 pounds. At first he appeared terrified, but as they spoke "he got more furious" and "that's when he made the move to come toward me." "There was a fire in his eyes that I had never seen before," and Debra was afraid. At that instant, "it was like he was the weapon, I was the victim, and he had made that move; I reacted," she said. "His hands were clenched into fists, and he was getting out of bed, coming at me."

¶ 19. Debra then shot her husband twice, once in his chest, once in his midsection.[3] An eight-year-old neighbor testified at trial that she heard the shots and that a second or two elapsed between the first and second shots.

¶ 20. Debra called 911. She told the operator that she and her husband had a fight and that, after he

[3] It is unclear which shot was fired first or which shot killed Harold Head. The doctor who performed the autopsy testified at trial that the shot to Harold's chest was sufficient to kill him, and the shot to his midsection was sufficient to kill him without near-immediate medical attention.

threatened to kill her, she shot him. She said that she did not mean to shoot her husband and did not know that the gun was loaded.

¶ 21. When police officers arrived, Debra went outside, crying. She told the officers "that her husband had been threatening her friends and that she shot him; that she didn't know the gun was loaded."

¶ 22. Detective David E. Bier entered the house and found Harold's body in the bedroom "on his back on the bed. His right leg was hanging over the edge of the bed and his left leg was still under the covers, and he had blankets over his upper torso and head." Blood covered the floor and was splattered on the walls, the ceiling, and the filing cabinet. Police officers found 26 guns, not counting the one used by Debra, in the bedroom. All 26 guns were unloaded, but ammunition for many of them was also found in the bedroom. The officers found firearms, ammunition, or knives in each of the other rooms of the house.

¶ 23. Debra gave officers two oral and two written statements at the police station. She repeatedly told officers that Harold had not physically abused her but that he had verbally abused her.

¶ 24. Debra Head was charged with first-degree intentional homicide, pursuant to Wis. Stat. § 940.01 (1997–1998).[4] She admitted that she had killed Harold, but claimed that she did so in self-defense. Prior to her jury trial, Debra filed a motion in limine, seeking to assert self-defense and to admit "*McMorris* evidence" concerning Harold's violent character and his prior

---

[4] All subsequent references to the Wisconsin Statutes are to the 1997–98 versions unless otherwise indicated.

212

specific violent acts.[5] She also sought to discuss her theory of defense and the proposed supporting evidence in her opening statement. The circuit court allowed Debra to allude to self-defense in her opening statement, but delayed ruling whether to admit the disputed evidence.

¶ 25. After the State presented its case, the court allowed Debra to make an offer of proof regarding the evidence she sought to admit. With the jury out, Debra testified about a 1991 incident in their house in which Harold was threatening to kick a stuffed and mounted animal. She went over to stop him. Harold "got really mad" and physically picked her up, throwing her off the arm of a couch. Debra hurt her back, could not get up, and had to be taken to a local emergency room for x-rays. "Now I suppose you're gonna tell everybody what I did," she quoted Harold as saying. She replied, "[n]o, I won't. We'll just make up a story," and tell people that "I fell out in the woods."

¶ 26. Debra described an incident in 1996 when Harold was angry with her and chased her in their house. "He chased me down the hallway towards our bedroom." He "grabbed me and then we flew on to the bed" and broke the bed frame, she said.

---

[5] Evidence of a victim's violent character and past violent acts is often referred to as *McMorris* evidence. The term "*McMorris* evidence" refers to *McMorris v. State,* 58 Wis. 2d 144, 150, 205 N.W.2d 559 (1973), a case in which this court ruled that a defendant who had established a "sufficient factual basis to raise the issue of self-defense" should be allowed to submit evidence of her personal knowledge of prior specific acts of violence by the victim of her assault.

¶ 27. She told how Harold once threw a wrench at her and how he routinely twisted her arms, sometimes picked her up by the armpits and lifted her up off the ground until she cried, and repeatedly twisted her breasts.

¶ 28. Debra said she had considered filing for divorce in 1982, but Harold threatened to kill her if she ever actually filed. He repeated that threat throughout their marriage. She said she stayed with him partly because of fear.

¶ 29. Debra also testified about a number of incidents of violence or threats of violence to others. For instance, in 1995 Harold threatened a supervisor at the General Motors plant where he worked, and was suspended for 30 days. He had to undergo counseling and began taking Paxil [a prescription drug used to treat mental depression, panic disorder, and generalized anxiety disorder]. He stopped taking the drug in 1997.

¶ 30. Debra described a "road rage" incident in September 1997 in which Harold thought a woman had cut him off as she backed out of a driveway. He yelled at the woman, then accelerated his vehicle, pulling in front of her car as they came to a red light. Then he stopped, jumped out of his truck, cursed at the woman, and kicked off the side mirror of her car.

¶ 31. Debra also noted two incidents in the 1990s involving a neighbor. In one incident, after an argument, Harold punched the neighbor in the face. At a later date, the neighbor complained about Harold shooting a pistol in the back yard. Harold walked over to the neighbor, pistol in hand, "and was gonna hit him with it. But then didn't hit him with the gun but hit him with his fist instead," Debra said.

¶ 32. Debra also referred to an incident in 1996 or 1997, in which Harold retaliated against a six-year-old

214

boy who had called him a vulgar name. Harold twisted the boy's arm, hurting him, and had to go to court as a result. The incident was offered as an example of Harold's short temper.

¶ 33. Debra said that Harold "always thought everyone was against him." Sometimes he would pound on the table, or throw things across the room. One time he pushed a microwave off the counter to the floor, and another time he broke all the buttons off the VCR.

¶ 34. In her offer of proof, Debra also testified in detail about the events that occurred the night before and the day of the shooting, as well as Harold's intense anger about his daughter's pregnancy.

¶ 35. After Debra made her offer of proof, the court determined that she had not established a sufficient factual basis to support a claim of self-defense. Therefore she was not allowed to present evidence regarding Harold's prior violent conduct and character for violence[6] and she could not argue at trial that she had acted in self-defense. The court based its decision

---

[6] The following two exchanges illustrate how the court's ruling excluding evidence surfaced during the defendant's testimony at trial. Debra explained the events that occurred after she and her daughter told Harold that Brenda was pregnant. She discussed Harold's return home that night and reported that his brother had taken away Harold's guns and his billy club.

DEBRA HEAD: It was like a police billy club. I believe he always carried it in his vehicles just in case he came across, as he would always say . . . [interruption]. He would always say in case he came across . . . some little fucker that pissed him off.

ASSISTANT DISTRICT ATTORNEY: I object to that. That's also within the scope of the ruling. I move to strike.

THE COURT: That motion is granted. That answer is stricken. Ladies and gentlemen, you are to disregard that answer.

on its review of Wisconsin precedent and its understanding that it could consider only contemporaneous threats made to the defendant in determining whether she had a sufficient factual basis to raise self-defense. The court noted that Harold's threat to Debra on May 29, 1998, was not accompanied by violence, and that Harold did not possess a weapon. The court therefore concluded that Harold's threat did not constitute a sufficient factual basis for her to assert self-defense.

¶ 36. At the close of evidence, Debra Head's defense counsel requested that the court submit jury instruction Wis JI—Criminal 1014, instructing the jury on perfect self-defense as a complete affirmative defense to first-degree intentional homicide and imperfect self-defense as a factor mitigating first-degree intentional homicide to second-degree intentional homicide. The court had allowed Debra to testify as to what occurred the night before and the morning of Harold's death and the events that had unfolded on and after the day that Harold learned of his daughter's pregnancy. It found that "subjectively she's met whatever she would need to meet, but I don't believe that she's met the

---

In another instance, as she described the shooting, Debra testified as follows: ·

DEFENSE COUNSEL: Did he have a weapon?

DEBRA HEAD: He was the weapon. His hands were weapons. From the past experience, I knew what he was capable of.

ASSISTANT DISTRICT ATTORNEY: Objection, judge. We have had hours worth of hearings on this point.

THE COURT: Yes, sustained.

ASSISTANT DISTRICT ATTORNEY: Motion to strike.

THE COURT: That portion of the answer will be stricken. The jury is to disregard that part of the answer.

objective half of the equation." Consequently, the court ruled that because Debra had failed to establish a sufficient factual basis to assert self-defense, she was not entitled to any jury instruction on self-defense. The court instructed the jury only on first-degree intentional homicide.

¶ 37. The jury returned a verdict of guilty of first-degree intentional homicide, and the circuit court sentenced Debra to a mandatory term of life in prison. The court allowed the Department of Corrections to determine the defendant's date of parole. Debra appealed, and the court of appeals affirmed in a scholarly decision written by Judge Deininger. *State v. Head,* 2000 WI App 275, 240 Wis. 2d 162, 622 N.W.2d 9. Judge Roggensack wrote a strong and effective dissent.

¶ 38. The court of appeals determined that the circuit court did not err in refusing to permit Debra to introduce *McMorris* evidence. *Id.* at ¶ 1. Citing *State v. Camacho,* 176 Wis. 2d 860, 869, 501 N.W.2d 380 (1993), the court concluded that both perfect and imperfect self-defense have objective as well as subjective components. *Id.* at ¶ 20. It said that Debra's claim of self-defense was based solely on her testimony and that her testimony "does not support her claim that she reasonably believed that she was acting in self-defense when she shot Harold." *Id.* at ¶ 13.[7]

---

[7] The court of appeals wrote:

She did not testify that her husband made a direct verbal threat against her, or that he engaged in any overtly violent acts or gestures, in the moments leading up to the shooting. Her testimony that she could not leave the bedroom was undermined by her statements that she was six feet from her husband, that he was lying down on the bed, and that she had a gun trained on him for several moments before she shot him.

¶ 39. Having found that Debra had not adequately raised the issue of self-defense, the court concluded that the evidence of Harold's past violent behavior and character was inadmissible. *Id.* at ¶ 17.

¶ 40. The court of appeals also determined that the circuit court did not err in declining to instruct the jury on self-defense and mitigation. *Id.* at ¶ 20. The court again based its decision on its conclusion that Debra had failed to make a threshold showing that she reasonably believed she was threatened with an unlawful interference, as required by *Camacho*. *Id.* at ¶¶ 20–21. The court found that because Debra had failed to make the required showing and was therefore unable to present evidence of a subjective belief that she was acting in self-defense, she was not entitled to instructions on either perfect or imperfect self-defense. *Id.* at ¶ 21.

## II. STANDARD OF REVIEW

■

¶ 41. This case requires the court to interpret Wis. Stat. §§ 939.48(1), 940.01(2) and (3), and 940.05. Statutory interpretation presents a question of law which this court reviews de novo, benefiting from the analyses of the circuit court and the court of appeals. *State v. Busch*, 217 Wis. 2d 429, 441, 576 N.W.2d 904 (1998).

¶ 42. This case also requires us to review the circuit court's decision to exclude proffered evidence and its decision not to submit certain instructions to the jury.

---

Based on Debra's own testimony, she was "in control" of the situation.

*Head*, 2000 WI App 275, ¶ 13–14.

■

¶ 43. The decision whether to admit or exclude evidence lies within the sound discretion of the circuit court. *Johnson v. Kokemoor,* 199 Wis. 2d 615, 635–36, 545 N.W.2d 495 (1996). In reviewing a discretionary decision, we examine the record to determine if the circuit court logically interpreted the facts, *State v. Rogers,* 196 Wis. 2d 817, 829, 539 N.W.2d 897 (Ct. App. 1995), applied the proper legal standard, and used a demonstrated rational process to reach a conclusion that a reasonable judge could reach. *Glassey v. Cont'l Ins. Co.,* 176 Wis. 2d 587, 608, 500 N.W.2d 295 (1993). To properly exercise its discretion, a circuit court must "apply the correct standard of law to the facts at hand." *State v. Margaret H.,* 2000 WI 42, ¶ 32, 234 Wis. 2d 606, 610 N.W.2d 475. This court will reverse a discretionary decision if the circuit court's exercise of discretion "is based on an error of law." *Marten Transport v. Hartford Specialty,* 194 Wis. 2d 1, 13, 533 N.W.2d 452 (1995). In its exercise of discretion, the circuit court's decisions to admit or exclude evidence are entitled to great deference, *Martindale v. Ripp,* 2001 WI 113, ¶ 29, 246 Wis. 2d 67, 629 N.W.2d 690, but we will reverse the circuit court if we determine that it applied an incorrect legal standard.

■■■■

¶ 44. Ultimately, the court's willingness to entertain a defendant's theory of defense and submit requested instructions to the jury is grounded on the evidence presented to the trier of fact. Whether there are sufficient facts to allow the giving of an instruction is a question of law which we review de novo. *State v. Mayhall,* 195 Wis. 2d 53, 57, 535 N.W.2d 473 (1995). A court errs when it fails to give an instruction on an issue raised by the evidence. *Id.* at 57–58 (citing *Lutz v.*

*Shelby Mut. Ins. Co.,* 70 Wis. 2d 743, 750, 235 N.W.2d 426 (1975)). If we determine that a circuit court has committed an error in failing to give a jury instruction, we must assess whether the substantial rights of the defendant have been affected. Wis. Stat. § 805.18(2). An error does not affect the substantial rights of a defendant if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *State v. Harvey,* 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189.

## III. ANALYSIS

¶ 45. At issue in this case are the standards for raising perfect self-defense as a defense to a charge of first-degree intentional homicide and unnecessary defensive force (imperfect self-defense) as a factor mitigating first-degree intentional homicide to second-degree intentional homicide. A related issue involves the standards governing the admission of *McMorris* evidence concerning a homicide victim's violent character and prior acts of violence. Presenting a defendant's theory of the case to the jury depends upon the evidence admitted at trial.

¶ 46. As noted above, the circuit court in this case did not allow Debra Head to assert self-defense in any form or to submit evidence, including *McMorris* evidence, supporting such claims. The court emphasized that in order to show unnecessary defensive force as a factor mitigating first-degree intentional homicide, a defendant is required to show that she had a "reasonable belief that she was preventing or terminating an unlawful interference with her person or actually believed that force—that the force used was necessary to prevent . . . imminent death or great bodily harm." The court determined that pursuant to *Camacho,* 176 Wis.

2d 860, "there is a subjective facet as well as objective facet to the defendant's actions and how the court must view a person—the facts and a person in those particular circumstances. Clearly the subjective facts are as testified by Miss Head as to what she thought in her own head and objective facts are basically what surrounded the event."

¶ 47. The court further stated that it had considered relevant precedent, and "all of that relevant case law describes facts with simultaneous violence or imminent threats of harm with a weapon in the hand of the victim as predicates to this type of testimony coming in." The court concluded that in this case:

> [T]he court feels it has to look at . . . whether there is a basis, a factual basis, [relying] strictly on the threats that were made to Miss Head . . . . [T]here was not a weapon in Mr. Head's hand. [H]e was not making a specific threat to Miss Head . . . I'm going to get you. I'm going to kill you . . . . Bottom line is it was a threat not accompanied by any use of weapons at that time, not accompanied by violence at that time.

¶ 48. The court added: "I think that the Court has to find a factual basis to let any of this evidence in that was testified to by Miss Head concerning the neighbor, concerning road rage, concerning these things that occurred in the '80s [and the 1991 incident resulting in Debra's back injury]. I have not found that factual basis, so I will not admit the same."

¶ 49. The court later stated that:

> [A]t least at this juncture in the trial there has been no—I'm looking at it from the *Camacho* aspect of the objective and subjective facet, concerning Miss Head's conduct at the time. Clearly the court feels that subjectively she's met whatever she would need to meet, but

I don't believe she's met the objective half of that equation. And there wasn't that sufficient factual basis, objective factual basis, to read that instruction at this point in time.

¶ 50. Debra now argues that the circuit court erred by requiring her to show a simultaneous act of violence, or the presence of a weapon, in order to raise self-defense. She also claims that the evidence presented in her offer of proof was sufficient to raise self-defense as an issue. In making this argument, she does not dispute that a defendant attempting to raise the issue of perfect self-defense to a charge of first-degree intentional homicide must meet an initial objective threshold. She asserts instead that her offer of proof was sufficient to meet the objective threshold.

¶ 51. Nor does she dispute the requirement of an objective reasonable threshold for a claim of unnecessary defensive force (imperfect self-defense) or ask that the holding in *Camacho* be overruled. In an amicus curiae brief, however, the Frank J. Remington Center calls into question the validity of the *Camacho* determination that to raise the issue of imperfect self-defense, a defendant must first meet an objective reasonable threshold. It asserts that pursuant to Wis. Stat. § 940.01(2)(b), as revised in 1988, an objective threshold is not required for the mitigation of first-degree intentional homicide. It claims that the legislative history of the 1988 revision of § 940.01 shows conclusively that the legislature did not intend to require a defendant to meet an objective threshold to assert imperfect self-defense.

¶ 52. The State asks us to reject any suggestion that *Camacho* misstates the requirements of raising imperfect self-defense. It contends that to establish a sufficient factual basis to raise self-defense, a defendant

must, pursuant to *Camacho,* meet an objective threshold by showing a reasonable belief that she was preventing or terminating an unlawful interference with the defendant's person. The State asserts that this threshold is the same whether a defendant claims perfect or imperfect self-defense, that to assert either type of self-defense, a defendant must make an initial threshold showing of objective reasonableness. The State contends that Debra Head failed to meet this objective threshold and therefore was not entitled to assert perfect or imperfect self-defense.

¶ 53. The initial questions for this court concern the standards for raising either perfect or imperfect self-defense, or both, to a charge of first-degree intentional homicide. To resolve these questions, we must examine the law of homicide in Wisconsin both before and after the 1988 revision of the homicide statutes and revisit this court's decision in *Camacho.* We begin with the law of homicide in Wisconsin.

A. Wisconsin's Law of Homicide

¶ 54. The law of homicide in Wisconsin was revised in 1988. 1987 Wis. Act 399. Prior to the revision, Chapter 940 listed nine homicide offenses, including first-degree murder, second-degree murder, and manslaughter. Wis. Stat. §§ 940.01, 940.02, 940.05 (1985–86).

¶ 55. Section 940.01(1), first-degree murder, read as follows: "Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony." Wis. Stat. § 940.01 (1985–86). Subsection (2) defined "intent to kill" to mean "the mental purpose to take the life of another human

223

being." Wis. Stat. § 940.02 (1985–86). This two-element offense was punishable by life imprisonment. Wis. Stat. § 939.50(3)(a) (1985–86).

¶ 56. Section 940.02, second-degree murder, prohibited the causing of death:

> (1) By conduct imminently dangerous to another and evincing a depraved mind, regardless of human life; or
>
> (2) As a natural and probable consequence of the commission of or attempt to commit a felony.

Wis. Stat. § 940.02 (1985–86). Second-degree murder was a Class B felony punishable by imprisonment not to exceed 20 years. Wis. Stat. § 939.50(3)(b) (1985–86).

¶ 57. Section 940.05, manslaughter, prohibited the causing of death:

> (1) Without intent to kill and while in the heat of passion; or
>
> (2) Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony; or
>
> (3) Because such person is coerced by threats made by someone other than his coconspirator and which cause him reasonably to believe that his act is the only means of preventing imminent death to himself or another; or
>
> (4) Because the pressure of natural physical forces causes such person reasonably to believe that his act is the only means of preventing imminent public disaster or imminent death to himself or another.

Wis. Stat. § 940.05 (1985–86). Manslaughter was a Class C felony punishable by imprisonment not to exceed 10 years. Wis. Stat. § 939.50(3)(c) (1985–86).

¶ 58. The 1988 revision categorizes homicides based upon the degree of culpability involved, as reflected in the mental element required for each offense.

Three of the framers of the revision—Walter Dickey, David Schultz, and James L. Fullin, Jr.—describe four gradations of mental element as follows:

> (1) The mental element is intentional when the actor has the purpose to cause death or is aware that death is practically certain to be caused by the conduct [Wis. Stat. § 939.23];
>
> · (2) The mental element is aggravated recklessness when the actor is aware that the conduct creates an unreasonable and substantial risk of death or great bodily harm to another under circumstances which show utter disregard for human life [Wis. Stat. §§ 939.24, 940.02];
>
> (3) The mental element is simple recklessness when the actor is aware that the conduct creates an unreasonable and substantial risk of death or great bodily harm to another [Wis. Stat. § 939.24];
>
> (4) The mental element is negligence when the actor should realize that the conduct creates a substantial and unreasonable risk of death or great bodily harm to another [Wis. Stat. § 939.25].

Walter Dickey, David Schultz & James L. Fullin, Jr., *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision*, 1989 Wis. L. Rev. 1323, 1330 [hereinafter *The Importance of Clarity*].

¶ 59. These different mental elements are now embodied in different homicide statutes carrying different penalties.

¶ 60. This case concerns an alleged intentional homicide. Intentional homicides are divided into two categories, first-degree and second-degree. First-degree intentional homicide, Wis. Stat. § 940.01, replaced first-degree murder, Wis. Stat. § 940.01 (1985–86). It provides in relevant part:

(1) OFFENSES. (a) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

. . . .

(2) MITIGATING CIRCUMSTANCES. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05:

(a) Adequate provocation. Death was caused under the influence of adequate provocation as defined in s. 939.44.

(b) *Unnecessary defensive force. Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.*

(c) Prevention of felony. Death was caused because the actor believed that the force used was necessary in the exercise of the privilege to prevent or terminate the commission of a felony, if that belief was unreasonable.

(d) Coercion; necessity. Death was caused in the exercise of a privilege under s. 939.45(1).

(3) *BURDEN OF PROOF. When the existence of an affirmative defense under sub. (2) has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1).*

Wis. Stat. § 940.01 (emphasis added).

¶ 61. Second-degree intentional homicide, Wis. Stat. § 940.05, replaced manslaughter, Wis. Stat. § 940.05 (1985–86). It provides in relevant part:

> (1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class B felony if:
>
> (a) In prosecutions under s. 940.01, the state fails to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) did not exist as required by s. 940.01(3); or
>
> (b) The state concedes that it is unable to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) did not exist. By charging under this section, the state so concedes.
>
> (2) In prosecutions under sub. (1), it is sufficient to allege and prove that the defendant caused the death of another human being with intent to kill that person or another.
>
> . . . .
>
> (3) The mitigating circumstances specified in s. 940.01(2) are not defenses to prosecution for this offense.

Wis. Stat. § 940.05.

¶ 62. First-degree intentional homicide and second degree-intentional homicide have two elements in common: (1) the causing of death (2) with intent to kill. The difference between the two degrees of homicide is the presence or absence of mitigating circumstances. The presence of mitigating circumstances, when not disproved by the state, reduces the degree of culpability involved, and likewise reduces the potential punishment. First-degree intentional homicides are punished

as Class A felonies. Wis. Stat. § 940.01(1). Second-degree intentional homicides are punished as Class B felonies. Wis. Stat. §§ 940.01(2), 940.05(1).

¶ 63. In this case, Debra Head attempted to raise the issue of self-defense as a complete defense to the charge of first-degree intentional homicide. She also attempted to raise unnecessary defensive force (imperfect self-defense) as a mitigating circumstance that would reduce the charge from first-degree intentional homicide to second-degree.

¶ 64. Wisconsin's self-defense statute, Wis. Stat. § 939.48, provides an affirmative defense to a person if the person *reasonably believes* that another is unlawfully interfering with her person, and if the person uses such force as the person *reasonably believes* is necessary to prevent or terminate the unlawful interference. Section 939.48(1) reads:

Self-defense and defense of others.

(1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person *reasonably believes* to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor *reasonably believes* is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor *reasonably believes* that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

Wis. Stat. § 939.48(1) (emphasis added).

¶ 65. This key subsection in the self-defense stat-
ute has three sentences. The first sentence, stating
general principles, is not adequate by itself to address
perfect self-defense to a charge of *intentional* homicide.

¶ 66. Self-defense can be a complete affirmative
defense to a variety of criminal charges, but the re-
quirements for perfect self-defense are increased for an
intentional homicide. Implicitly, the statute provides a
perfect defense to a person charged with an intentional
homicide when the person *reasonably* believed that an
interference with her person involved the danger of
imminent death or great bodily harm and *reasonably*
believed that it was necessary to use force which was
intended or likely to cause death or great bodily harm to
prevent or terminate that interference.

¶ 67. We are speaking here in the context of
*intentional* killings—not reckless killings, or negligent
killings, or accidental killings. In these *intentional*
homicides, a defendant is *not* privileged to use deadly
force—that is, force which is intended or likely to cause
death or great bodily harm—unless the person reason-
ably believes that the level of unlawful interference is
such that the force used is necessary to prevent immi-
nent death or great bodily harm. Hence, if a person
reasonably believed that she was preventing or termi-
nating an unlawful interference with her person and
reasonably believed that the force used was necessary
to prevent imminent death or great bodily harm, she is
not guilty of either first- or second-degree intentional
homicide.

¶ 68. Imperfect self-defense was a component of
the pre-revision manslaughter statute, Wis. Stat.
§ 940.05. The former § 940.05 referenced imperfect
self-defense as the causing of death "unnecessarily, in

the exercise of [the person's] privilege of self-defense." Wis. Stat. § 940.05(2) (1985–86).

¶ 69. Unnecessary defensive force, codified in Wis. Stat. § 940.01(2)(b), is the current equivalent of imperfect self-defense. It applies to situations in which a person intentionally caused a death but did so because she had an *actual belief* that she was in imminent danger of death or great bodily harm and an *actual belief* that the deadly force she used was necessary to defend her against this danger, if *either* of these beliefs was not reasonable. Under these circumstances, the crime of first–degree intentional homicide is mitigated to second-degree intentional homicide.

¶ 70. To sum up, under the present statutes, to prove first-degree intentional homicide, the state must prove that the defendant caused the death of another with intent to kill. Wis. Stat. § 940.01(1). If perfect self-defense is placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that one of the defendant's beliefs was not reasonable. Wis. Stat. § 939.48(1). If unnecessary defensive force is been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the defendant did not actually believe she was preventing or terminating an unlawful interference with her person *or* did not actually believe that the force she used was necessary to prevent imminent death or great bodily harm—even if those beliefs were unreasonable—to sustain a conviction for first-degree intentional homicide.

¶ 71. This brings us to the standards and requirements for raising perfect and imperfect self-defense.

### B. *State v. Camacho*

¶ 72. In 1993 this court determined the standards for raising self-defense in *Camacho,* 176 Wis. 2d 860, a case involving the crime of attempted first-degree murder under the pre-revision homicide statutes.[8] Camacho shot a deputy sheriff four times after the deputy had stopped his vehicle as it traveled on the highway. *Id.* at 865. Camacho, an illegal alien, informed the deputy that he did not have a driver's license. *Id.* at 865–66. The deputy returned to his squad car and verified that Camacho had no driver's license, and then again approached Camacho's car. *Id.* at 866. According to the deputy, when he leaned in towards Camacho's open window, Camacho grabbed an automatic weapon and shot him four times. *Id.*

¶ 73. Camacho's version of the events differed significantly from the deputy's. He testified that the deputy had approached his car with his gun drawn, reached through the window and grabbed Camacho by the hair, and pointed his gun at Camacho's face. *Id.* Camacho asserted that he pulled away from the deputy and grabbed his own gun. *Id.* He admitted that he then shot the deputy. *Id.*

¶ 74. The State impeached Camacho's testimony at trial by presenting evidence of his prior statements to the effect that he was angry with the deputy because the deputy had allegedly called him crazy, but that the deputy had not pointed his gun at Camacho. *Id.*

---

[8] Although the Wisconsin Supreme Court opinion in *Camacho* was issued in 1993, the events at issue in the case occurred on March 3, 1988, before the January 1, 1989 effective date of the revisions to the homicide statutes. *State v. Camacho,* 176 Wis. 2d 860, 871 n.3, 501 N.W.2d 380 (1993). Therefore the court applied the pre-revision homicide statutes in deciding the case.

¶ 75. The circuit court instructed the jury on attempted first-degree murder, self-defense, and attempted manslaughter. *Id.* at 867. The court did not read the standard jury instructions but instead instructed the jury that, as to perfect self-defense, if Camacho's "conduct was not in self-defense or the defendant was not entitled to use self-defense and the belief by the defendant that he was entitled to use self-defense was unreasonable, then the defendant is guilty of the crime of attempted first degree murder." *Id.* The court also instructed the jury on "attempted imperfect self-defense manslaughter," stating that to find Camacho guilty it must find that Camacho intended to kill the deputy, and *"was entitled to believe under the facts in this case that he was acting in self-defense,* but the amount of force used was unnecessary or excessive." *Id.* (emphasis added).

¶ 76. The jury found Camacho guilty of attempted first-degree murder. *Id.* at 868. The court of appeals reversed, concluding that the instructions submitted to the jury by the circuit court "seriously misstated the law" and "constituted prejudicial error." *Id.* (quoting *State v. Camacho,* 170 Wis. 2d 53, 59, 487 N.W.2d 67 (Ct. App. 1992)).

¶ 77. This court reversed the court of appeals, holding that "a defendant charged with first-degree murder must show a reasonable belief that he was preventing or terminating an unlawful interference with his person before he can obtain a conviction of imperfect self-defense manslaughter." *Id.*

¶ 78. The *Camacho* court stated that "the absolute privilege of perfect self-defense" is applicable when a defendant shows all three of the following elements:

> (1) the defendant reasonably believed that he was preventing or terminating an unlawful interference

232

> with his person; (2) the defendant reasonably believed
> that force or threat thereof was necessary to prevent or
> terminate the interference; and (3) the defendant rea-
> sonably believed that the actual amount of force used
> was necessary to prevent or terminate the interference.

*Id.* at 869. Therefore, to acquit on the grounds of perfect self-defense, a jury must be able to believe that all three beliefs were reasonable.

¶ 79. The court stated that according to Wis. Stat. § 940.05 (1985–86), "imperfect self-defense manslaughter applies when a defendant causes the death of another human being 'in the exercise of his privilege of self-defense.'" *Id.* at 871. Noting that Wis. Stat. § 939.48(1) (1985–86) provided in part that "[a] person is privileged to threaten or intentionally use force against another *for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person*," the court determined that "a person is privileged to act in self-defense only if that person reasonably believes that he is preventing or terminating an unlawful interference with his person." *Id.* at 871–72. The court concluded, after reading former Wis. Stat. § 940.05 together with § 939.48, that for an *intentional* killing to constitute imperfect self-defense manslaughter, a defendant must show that he was exercising his privilege of self-defense. *Id.* Thus, a jury could not convict a defendant on the lesser charge of imperfect self-defense manslaughter without first finding that the defendant had met the threshold showing that the defendant's belief in the existence of an unlawful interference was reasonable. *Id.*

¶ 80. The *Camacho* decision was based on the 1985–86 version of the Wisconsin Statutes. *Id.* at 871 n.3. In its decision, however, the *Camacho* court also

addressed the 1988 revision of the statutes, concluding that the legislature did not alter the crime of imperfect self-defense manslaughter, which "still consists of an objective threshold element and two subjective elements even though the Legislature changed the language of the statute."[9] *Id.* at 882–83. The court concluded that under the revised statutes, a defendant must first show an objectively reasonable belief that she was preventing or terminating an unlawful interference with her person. *Id.* at 883.

> Once a defendant passes this first hurdle, he is then entitled to a conviction of imperfect self-defense manslaughter if: (1) he had an actual, but unreasonable, belief that force was necessary because the unlawful interference resulted in an imminent danger of death or great bodily harm; or (2) he possessed a reasonable belief that force was necessary because the unlawful interference resulted in an imminent danger of death or great bodily harm but his belief regarding the amount of force necessary was unreasonable.

*Id.*

¶ 81. Although the *Camacho* decision states that the old requirements for raising imperfect self-defense are applicable to the revised homicide statutes, these new statutes were not in play before the court.[10]

---

[9] We note that while the pre-revision Wis. Stat. § 940.05(2) (manslaughter) referred to causing death "*unnecessarily, in [the] exercise of the privilege of self-defense,*" the current Wis. Stat. § 940.05(2) (second-degree intentional homicide) refers to causing death with "*[u]nnecessary defensive force.*" Wis. Stat. § 940.05(2) (emphasis added). The current statute eliminates any reference to the "privilege of self-defense."

[10] For a critique of the *Camacho* decision's extension of an objective element to unnecessary defensive force under the revised homicide statutes, see Heather Ann Lieser, Note, *State*

Therefore, to determine whether a defendant must still meet the same objective threshold to assert imperfect self-defense after the 1988 revision, we will re-examine and interpret the statutes in question.

## C. Statutory Interpretation

¶ 82. Our goal in interpreting a statute is to discern and give effect to the intent of the legislature. *County of Jefferson v. Renz,* 231 Wis. 2d 293, 301, 603 N.W.2d 541 (1999). We first examine the plain language of the statute to determine if it clearly and unambiguously sets forth the legislative intent. *State v. Setagord,* 211 Wis. 2d 397, 406, 565 N.W.2d 506 (1997). If it does, we need go no further in interpreting the statute. However, if the statutory language is unclear or ambiguous, we may look to the scope, history, context, subject matter, and object of the statute to determine the legislative intent. *Teague v. Bad River Band of the Lake Superior Tribe of Chippewa Indians,* 2000 WI 79, ¶ 17, 236 Wis. 2d 384, 612 N.W.2d 709. Statutory language is ambiguous if it is capable of being understood in two or more different ways or in two or more different senses by reasonably well-informed persons. *Id.; Setagord,* 211 Wis. 2d at 406.

¶ 83. We look again at the language of the relevant statutes. Wisconsin Stat. § 939.48, Self-defense and defense of others, also referred to as perfect self-defense, provides in relevant part:

> (1) A person is privileged to threaten or intentionally use force against another for the purpose of pre-

*v. Camacho: The Judicial Creation of an Objective Element to Wisconsin's Law of Imperfect Self-Defense Homicide,* 1995 Wis. L. Rev. 741–764.

venting or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

Wis. Stat. § 939.48(1).

¶ 84. To raise the issue of perfect self-defense, a defendant must meet a reasonable objective threshold. The trial evidence must show: (1) a reasonable belief in the existence of an unlawful interference; and (2) a reasonable belief that the amount of force the person intentionally used was necessary to prevent or terminate the interference. Wis. Stat. § 939.48(1).

¶ 85. Imperfect self-defense (unnecessary defensive force) mitigates the crime of first-degree intentional homicide. Wisconsin Stat. § 940.01(2) and (3) provide in relevant part:

> (2) MITIGATING CIRCUMSTANCES. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05:
>
> . . . .
>
> (b) Unnecessary defensive force. Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, *if either belief was unreasonable.*
>
> . . . .

(3) BURDEN OF PROOF. When the existence of an affirmative defense under sub. (2) has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1).

Wis. Stat. § 940.01(2) and (3) (emphasis added).

¶ 86. Wisconsin Stat. § 940.05, Second-degree intentional homicide, provides in relevant part:

(1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class B felony if:

(a) In prosecutions under s. 940.01, the state fails to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01 (2) did not exist as required by s. 940.01 (3).

Wis. Stat. § 940.05.

¶ 87. These statutes are not ambiguous. Wisconsin Stat. § 939.48(1) requires *reasonable* beliefs for perfect self-defense in every case. By contrast, Wis. Stat. § 940.01(2)(b) does not require reasonable beliefs. It requires only *actual* beliefs even if they are unreasonable. Unnecessary defensive force mitigates only one crime, first-degree intentional homicide.

¶ 88. First-degree intentional homicide is mitigated to second-degree intentional homicide if a person intentionally causes a death because of an *actual* belief that the person is in imminent danger of death or great bodily harm, and an *actual* belief that the use of deadly

237

force is necessary to defend herself, even if both of these beliefs are not reasonable.[11] Wis. Stat. § 940.01(2)(b).

¶ 89. A defendant is entitled to prevail in this affirmative mitigation defense to first-degree intentional homicide unless the state is able to disprove part of the defendant's state of mind beyond a reasonable doubt. This requires that the state show that the defendant did not have an *actual* belief in one or both elements.

¶ 90. If a defendant had an *actual* but unreasonable belief that she was in imminent danger of death or great bodily harm and an *actual* but unreasonable belief that the force she used was necessary to defend herself, the defendant may prevail on imperfect self-defense, but not perfect self-defense, because perfect self-defense requires objective reasonableness.

¶ 91. The imperfect self-defense statute does not require an initial threshold showing of an objectively reasonable belief in the existence of an unlawful interference before this defense can be asserted. Such a requirement directly contravenes the language of Wis. Stat. § 940.01(2)(b), which explicitly provides that first-degree intentional homicide is mitigated to second degree if: "Death was caused because the actor believed he or she or another was in imminent danger of death

---

[11] Using different terms, a defendant may claim imperfect self-defense to first-degree intentional homicide if the defendant has a subjective belief that she is in imminent danger of death or great bodily harm and a subjective belief that she must use deadly force to prevent or terminate this danger, even if both of these beliefs—actually held—are unreasonable.

238

or great bodily harm and that the force used was necessary to defend the endangered person, *if either belief was unreasonable.*" Wis. Stat. § 940.01(2)(b) (emphasis added).

¶ 92. Although we usually do not consider extrinsic sources to aid our interpretation of a statute when we find statutory language unambiguous, we are mindful that our interpretation is at odds with the court's determination in *Camacho.* We therefore consider extrinsic sources to ensure that our interpretation of the homicide and self-defense statutes gives effect to the intent of the legislature. *See State v. Perez,* 2001 WI 79, ¶ 36, 244 Wis. 2d 582, 628 N.W.2d 820. The legislative history of the revision of Wisconsin's homicide statutes offers compelling evidence to support our interpretation.

¶ 93. As discussed above, Wisconsin's homicide statutes were revised in 1988. The revision, which took effect on January 1, 1989, was largely the work of a Special Committee on Homicide and Lesser Included Offenses (Committee), appointed by the Wisconsin Judicial Council in 1982.[12] The Committee's draft was introduced as 1985 S.B. 279. It was not acted upon but

---

[12] The 17–member Committee was chaired by Professor Walter Dickey. The other members were Wisconsin Supreme Court Justice Shirley S. Abrahamson; Judge Michael J. Barron; Asst. Atty. Gen. David J. Becker; William U. Burke; William M. Coffey; Francis R. Croak; Jerome L. Fox; State Sen. Donald Hanaway; Asst. Dist. Atty. Michael Malmstadt; Judge Gordon Myse; Orlan L. Prestegard; Prof. Frank J. Remington; Asst. Pub. Def. Michael J. Rosborough; Rep. James A. Rutkowski; Janet Schipper; and Prof. David E. Schultz. James L. Fullin, Jr. was the reporter. Walter Dickey, David Schultz & James L. Fullin, Jr., *The Importance of Clarity in the Law of Homicide:*

was reintroduced the following session as 1987 S.B. 191, and its provisions were inserted into the 1988 budget review bill. 1987 Wis. Act 399.

¶ 94. After the original proposal was drafted, and approved by the Judicial Council, it was reviewed by the Wisconsin Department of Justice, the Wisconsin District Attorneys Association, the State Public Defender, and a committee created by the State Bar of Wisconsin. *See The Importance of Clarity, supra* at 1328. The Judicial Council considered the recommendations it received and debated an amendment proposed by the Wisconsin District Attorneys Association (WDAA).

¶ 95. The WDAA objected to the unnecessary defensive force statute. Judicial Council Minutes of Apr. 19, 1985, at 9. It proposed amending the statute to provide that first-degree intentional homicide is mitigated to second-degree when "[d]eath was caused because the actor, *in the exercise of the privilege of self-defense or the defense of others,* believed he or she or another was in imminent danger of death or great bodily harm, if that belief was unreasonable" *Id.* (emphasis added).

¶ 96. Assistant Attorney General David J. Becker, a member of the Committee, explained the proposed amendment, stating that it was raised in reference to a hypothetical situation in which a paranoid psychotic killed a girl scout delivering cookies because he unreasonably believed she was carrying not cookies but a bomb. *Id.* at 10–11. Becker explained that "under the WDAA proposal, one could still escape liability for first degree murder by believing one's life to be in danger, regardless of the reasonableness of that belief. However,

*The Wisconsin Revision,* 1989 Wis. L. Rev. 1323, 1326 n.7 [hereinafter *The Importance of Clarity*].

there must be a reasonable belief that the victim has unlawfully interfered with his person." *Id.* at 11. Becker expressed his belief that the then-current manslaughter statute applied only to actions undertaken "in the exercise of the privilege of self-defense." *Id.*

¶ 97. The Judicial Council entertained a motion to insert the words "in the exercise of the privilege of self-defense" into the draft of the second-degree intentional homicide statute. The motion was defeated, 6 to 5 with 1 abstention. *Id.* at 13.

¶ 98. The issue was raised again in a letter from Attorney General Bronson C. La Follette to Senator Lynn S. Adelman. La Follette wrote that he supported the "comprehensive revision of Wisconsin's homicide statutes prepared by the Judicial Council." Letter from Attorney General Bronson C. La Follette to Lynn S. Adelman, Chairperson of the Senate Committee on Judiciary and Consumer Affairs (August 16, 1985). However, La Follette asked Senator Adelman's committee to restore the phrase "in the exercise of the privilege of self-defense or defense of others." La Follette wrote:

> I make that suggestion because of concern about the person who kills another having no objective basis for resorting to self-defense of any sort (e.g., the paranoid psychotic who shoots down the girl scout approaching his front door, believing the box of cookies she is carrying to be a bomb intended to destroy him). The Judicial Council's proposal would appear to allow such a person to escape conviction of first-degree intentional homicide (present first-degree murder). Application of the mitigating circumstance of unnecessary defensive force ought at least to be conditioned on a reasonable belief that some unlawful interference with the person, though perhaps not one justifying resort to deadly force, was threatened. The restoration of the

241

words, "in the exercise of the privilege of self-defense or defense of others," is designed to impose that requirement.

*Id.*

¶ 99. Tellingly, even though both the Wisconsin District Attorneys Association and the Department of Justice specifically asked to amend the proposed second-degree intentional homicide revision by inserting a "reasonable belief of an unlawful interference" threshold, neither the Judicial Council nor the legislature inserted such a requirement. Instead, the Judicial Council's bill was introduced without language establishing a reasonableness threshold, and the legislature enacted it in the same form. In effect, the legislature accepted the Judicial Council's bill in toto.

¶ 100. The intent of the Special Committee on Homicide is illuminated in *The Importance of Clarity,* which was published nearly contemporaneously with the effective date of the revision and authored by the chair of the committee, another member of the committee, and the committee's reporter (Walter Dickey, David Schultz, and James L. Fullin, Jr., respectively). *The Importance of Clarity, supra* at 1393 n.7.[13] In *The Importance of Clarity,* the writers state:

---

[13] This court has recognized that articles by drafters of statutes, authored contemporaneously with the enactment of the statutes, may be viewed as "authoritative statement[s] of legislative intention." *State v. Genova,* 77 Wis. 2d 141, 151, 252 N.W.2d 380 (1977) (*quoting State v. Hoyt,* 21 Wis. 2d 284, 299–300, 128 N.W.2d 645 (1964)). The court has also stated that a law review article by the principal drafter of the 1956 revised criminal code, published contemporaneously with enactment of the code, was "persuasive authority when construing a particular statute." *State v. Williquette,* 129 Wis. 2d 239, 254, 385 N.W.2d 145 (1986).

The mitigating circumstance identified in section 940.01(2)(b) is referred to as "unnecessary defensive force" and is the equivalent of what became known as "imperfect self defense" under prior law. The basis for the mitigation is the defendant's actual (subjective) belief that it was necessary to use force to defend herself (or another) from imminent death or great bodily harm. *If such a belief is actually held, it mitigates first-degree intentional homicide to second-degree intentional homicide, even if the belief is unreasonable.*

*Id.* at 1333 (emphasis added).

¶ 101. Thus, our determination that an objective threshold is not required to raise imperfect self-defense is consistent with the articulated public policy behind the statutory revisions. The homicide revision "advances the principle that degrees of culpability should reflect the different mental states required for each offense. The revision created offenses that have clearly defined mental elements and assigned penalties based on the relative blameworthiness of the conduct." *Id.* at 1333. As Justice Bablitch later observed in *Camacho*:

[a] person who has previously been the victim of a violent crime who later panics and under an unreasonable but actual belief takes the life of another because he or she actually believes that his or her person is in danger is not as culpable as one who kills in cold-blood for no reason other than to murder another. These two people should not be treated the same.

*Camacho,* 176 Wis. 2d at 887 (Bablitch, J., dissenting).

¶ 102. The revised statute contemplates that a person who causes a death because she *actually* believes that she is in imminent danger of death or great bodily harm, even if that belief is unreasonable, is less culpable than one who simply kills, with the intent to kill, without mitigating circumstances.

243

¶ 103. Based on the plain language of Wis. Stat. § 940.05(2), supported by the legislative history and articulated public policy behind the statute, we conclude that when imperfect self-defense is placed in issue by the trial evidence, the state has the burden to prove that the person had no actual belief that she was in imminent danger of death or great bodily harm, or no actual belief that the amount of force she used was necessary to prevent or terminate this interference. If the jury concludes that the person had an actual but unreasonable belief that she was in imminent danger of death or great bodily harm, the person is not guilty of first-degree intentional homicide but should be found guilty of second-degree intentional homicide.

¶ 104. In light of this analysis, we must modify *Camacho* to the extent that it states that Wis. Stat. § 940.01(2)(b) contains an objective threshold element requiring a defendant to have a *reasonable* belief that she was preventing or terminating an unlawful interference with her person in order to raise the issue of unnecessary defensive force (imperfect self-defense).

D. Placing Self-Defense and Imperfect Self-Defense in Issue

¶ 105. Having determined that no "objective reasonable" threshold is required to raise a claim of imperfect self-defense, we turn to the question of how to raise the issue of self-defense at trial.

¶ 106. Perfect self-defense is a privilege recognized in Wis. Stat. § 939.45(2). Before a privilege may be considered by the fact-finder, the defendant must raise the privilege as an affirmative defense. *State v. Trentadue,* 180 Wis. 2d 670, 674, 510 N.W.2d 727 (Ct.

App. 1993). Once the defendant successfully raises an affirmative defense, the state is required to disprove the defense beyond a reasonable doubt. *State v. Stoehr,* 134 Wis. 2d 66, 84 n.8, 396 N.W.2d 177 (1986).

¶ 107. Unnecessary defensive force is also an affirmative defense, Wis. Stat. § 940.01(2), but not a privilege under Wis. Stat. § 939.45. When the issue of unnecessary defensive force (imperfect self-defense) "has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1)." Wis. Stat. § 940.01(3).

¶ 108. In this case, the circuit court concluded that Debra Head failed to establish a sufficient factual basis to support any claim of self-defense. The court found that Debra failed to raise either perfect or imperfect self-defense so as to require it to admit self-defense evidence or submit the requested self-defense instructions to the jury. The court followed *Camacho,* and ruled that the threshold for admitting evidence to support imperfect self-defense was the same as the objective reasonable threshold for admitting evidence to support perfect self-defense. The court also concluded that *McMorris* evidence could not be used to establish the factual basis required for either theory of self-defense. We disagree with several of these determinations.

¶ 109. In a case of this nature, in which the defendant is charged with first-degree intentional homicide, the defendant will consider each potential defense. For instance, the defense theory may be that the defendant did not *intend* to kill. This defense could lead to conviction of a lesser charge, with a reduced penalty. The defense may emphasize one of the factors under Wis. Stat. § 940.01(2), such as adequate provocation or

unnecessary defensive force, to mitigate the offense to second-degree intentional homicide, which also carries a reduced penalty. The defense may claim perfect self-defense under Wis. Stat. § 939.48(1), which would permit the jury to find the defendant not guilty of any offense.

¶ 110. Raising the affirmative defense of unnecessary defensive force should not present great difficulty. We have already determined that the defendant is not required to meet an objective reasonable threshold. Consequently, unnecessary defensive force must have a lower threshold for the admissibility of evidence than perfect self-defense, which does have an objective reasonable threshold. Unnecessary defensive force also has a lower threshold than "adequate provocation," because "provocation" is defined as "something which the defendant *reasonably* believes the intended victim has done which causes the defendant to lack self-control completely at the time of causing death." Wis. Stat. § 939.44(1)(b) (emphasis added).

¶ 111. Debra Head argues that a defendant attempting to place self-defense in issue should be required to meet a burden of production, not a burden of persuasion. We agree. This court addressed the procedure for raising a mitigating circumstance with an objective threshold in *State v. Felton,* 110 Wis. 2d 485, 329 N.W.2d 161 (1983), a case in which a defendant claimed that she had killed her husband in the "heat of passion." The court stated that:

> The burden upon the defendant where a heat-of-passion defense is projected is merely the burden of production as opposed to the burden of persuasion. *It is*

*for the accused to come forward with some evidence* in rebuttal of the state's case—evidence sufficient to raise the issue of the provocation defense. The burden of persuasion, of course, always remains upon the state.

*Felton,* 110 Wis. 2d at 507 (emphasis added).[14]

¶ 112. We concluded in *Felton* that to place a mitigating factor in issue, there need be only "some" evidence supporting the defense. *Id.*

¶ 113. This court expounded on the "some"-evidence standard in *State v. Mendoza,* 80 Wis. 2d 122, 258 N.W.2d 260 (1977),[15] where we examined the showing required to warrant the submission of a manslaughter instruction to the jury. The court stated that in determining whether to submit an instruction regarding imperfect self-defense, the circuit court must determine whether a reasonable construction of the evidence will support the defendant's theory "viewed in the most favorable light it will 'reasonably admit of from the standpoint of the accused.' " *Id.* at 153 (quoting *Ross v. State,* 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973)). The court concluded that if the evidence viewed most favorably to the defendant supported the defendant's theory, it was the role of the jury to determine whether to believe the defendant's theory. *Id.* In other words, "if under any reasonable view of the evidence the jury could have a reasonable doubt as to the nonexistence of

---

[14] Barbara Felton admitted to killing her husband while he slept, but claimed that she was a battered spouse and had acted in self-defense. *State v. Felton,* 110 Wis. 2d 485, 488, 329 N.W.2d 161 (1983). She claimed on appeal that her trial counsel was ineffective in not asserting that she had acted in the "heat-of-passion," which qualified as manslaughter under the pre-revision Wis. Stat. § 940.05(1). *Id.*

[15] For additional discussion, see *State v. Schulz,* 102 Wis. 2d 423, 307 N.W.2d 151 (1981).

the mitigating circumstance, the burden has been met." *The Importance of Clarity, supra* at 1347.

¶ 114. The standard established in *Felton* and *Mendoza* for determining whether a defendant is entitled to submission of a jury instruction based on self-defense cannot be *lower* than the standard for raising this issue before trial for the purpose of admitting evidence. The court of appeals, in this case, wrote that our citation to *Thomas v. State,* 53 Wis. 2d 483, 192 N.W.2d 864 (1972), in the *McMorris* case, implied that the question "whether to admit evidence of a defendant's knowledge of prior acts of violence on the part of the victim should be decided on the same standard as that applied when determining whether the jury may be instructed on the issue of self-defense." *Head,* 2000 WI App 275, ¶ 10 n.7.

¶ 115. We think that the standard for giving a jury instruction on self-defense may, in some circumstances, be *higher* than the standard for admitting self-defense evidence at trial, because a defendant's claim of self-defense may be so thoroughly discredited by the end of the trial that no reasonable jury could conclude that the state had not disproved it. In any event, the threshold for admitting evidence at trial is either lower or the same as the threshold for giving a jury instruction. This means that if, before trial, the defendant proffers "some" evidence to support her defense theory and if that evidence, viewed most favorably to her, would allow a jury to conclude that her theory was not disproved beyond a reasonable doubt, the factual basis for her defense theory has been satisfied.

¶ 116. Logically, the threshold for perfect self-defense evidence is higher than the threshold for imperfect self-defense evidence because of the objective reasonableness required for perfect self-defense and because the consequences for the state of not disproving perfect self-defense are much greater than the consequences of not disproving imperfect self-defense. Nonetheless, the elements of the two affirmative defenses so overlap that it would be very challenging for the court to exclude evidence that could come in for one affirmative defense but not for the other. These issues should be clearer at the close of trial after all the evidence has come in. Although it may be difficult, as the State suggests, to "unring the bell" after a defendant has alluded to perfect self-defense throughout the trial, the defendant is not entitled to a perfect self-defense instruction unless perfect self-defense has a reasonable basis in the evidence.

¶ 117. We next consider what evidence a court should consider in determining whether "some" evidence exists to place self-defense in issue. In this case, Debra Head filed a motion in limine seeking to admit *McMorris* evidence regarding Harold Head's violent character and his past acts of violence.

¶ 118. After Debra made her offer of proof, the circuit court determined that she had not established that a sufficient factual basis existed to support a claim of self-defense. The court therefore did not allow Debra to present *McMorris* evidence of Harold's violent character and past acts of violence.

¶ 119. In determining whether Debra had established a sufficient factual basis to raise self-defense, the circuit court focused on the testimony regarding events that occurred the night before and the morning of the

shooting. It excluded most of the evidence that was not contemporaneous with the shooting, including past incidents of Harold's physical abuse to Debra herself.

¶ 120. In its brief to this court, the State asserted that the circuit court was correct in not considering non-contemporaneous evidence and evidence of violence to others in evaluating the sufficiency of Debra's showing of "some" evidence of self-defense. In essence, the State asserted that a defendant wishing to introduce *McMorris* evidence is required to make an objective threshold showing of a factual basis for a self-defense claim without using the *McMorris* evidence. According to the State's brief, if a defendant made an objective threshold showing separate from the *McMorris* evidence, the *McMorris* evidence would be probative; however, if the defendant could not make a separate showing, the *McMorris* evidence would have no probative value. This position has some textual support in *McMorris,* where the court said that the question was whether the defendant, "*after establishing a factual basis to raise the issue of self-defense,* may introduce evidence of personal knowledge of prior acts of violence on the part of the victim to prove what the defendant believed to be the turbulent and violent character of the victim." *McMorris v. State,* 58 Wis. 2d 144, 147, 205 N.W.2d 559 (1973) (emphasis added).

¶ 121. Prior to oral argument, however, the State altered its position, "acced[ing] to the view that a defendant can use *McMorris* evidence to establish the factual basis for a claim of self-defense and can use it to satisfy both the subjective and objective prongs of the *Camacho* test." Letter from Christopher G. Wren, Assistant Attorney General, to Wisconsin Supreme Court (October 4, 2001).

¶ 122. We accept the State's concession that *McMorris* evidence may be used to establish a factual basis to support a self-defense claim. *McMorris* evidence may not, as we held in *McMorris,* be *admitted* if a sufficient factual basis for a claim of self-defense is not established, but the *McMorris* decision does not mandate that a defendant establish her sufficient factual basis for self-defense wholly separate from the proffered *McMorris* evidence.

██

¶ 123. We conclude that evidence of a victim's violent character and of the victim's prior acts of violence of which a defendant has knowledge should be considered in determining whether a sufficient factual basis exists to raise a claim of self-defense. Such evidence may be probative of a defendant's state of mind and whether she actually believed that an unlawful interference was occurring, that danger of death or great bodily harm was imminent, or that she needed to use a given amount of defensive force to prevent or terminate the unlawful interference. In determining any of these issues, the circuit court should consider all the evidence proffered.

¶ 124. In summary, we conclude that a defendant need not meet an objective reasonable threshold to assert imperfect self-defense. Rather, the defendant must show evidence of actual beliefs that she was in imminent danger of death or great bodily harm and that the force she used was necessary to defend herself. In order to place imperfect self-defense in issue, a defendant need present only "some" evidence of self-defense. In determining whether the defendant has established a sufficient factual basis for the defense, the circuit court should consider all the evidence at hand,

including evidence presented by the state and any *McMorris* evidence that is proffered.

¶ 125. If a defendant were charged with second-degree intentional homicide instead of first-degree intentional homicide, the mitigating circumstances specified in Wis. Stat. § 940.01(2) would not be available as defenses. Wis. Stat. § 940.05(3). In these circumstances, a defendant claiming perfect self-defense has to meet the same "some"-evidence standard, but her evidence would be measured against an objective reasonable threshold.

E. Admission of *McMorris* Evidence

¶ 126. In a case in which a defendant asserts self-defense and wishes to present *McMorris* evidence, the court must determine whether the defendant has sufficiently placed self-defense into issue. *McMorris*, 58 Wis. 2d at 152. If the court determines that the defendant has presented a sufficient factual basis for a claim of self-defense, it must determine whether to admit any or all of the proffered *McMorris* evidence. *Id.*

¶ 127. Evidence of other crimes, wrongs, or acts is generally irrelevant and inadmissible in criminal actions:

> (2) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Wis. Stat. § 904.04(2). However, when a defendant sufficiently raises the issue of self-defense in a trial for homicide or assault, such evidence may be relevant and admissible.

■

¶ 128. Admissibility is not automatic. As a general rule, *McMorris* evidence may not be used to support an inference about the victim's actual conduct during the incident. *Werner v. State,* 66 Wis. 2d 736, 743, 226 N.W.2d 402 (1975).

> [T]he testimony relates to the defendant's state of mind, showing what [her] beliefs were concerning the victim's character. Such evidence helps the jury determine whether the defendant "acted as a reasonably prudent person would under similar beliefs and circumstances" in the exercise of the privilege of self-defense [if the defense theory is perfect self-defense].

*Id.* It may be admitted because it "bear[s] on the reasonableness of the defendant's apprehension of danger at the time of the incident." *McMorris,* 58 Wis. 2d at 149.

■

¶ 129. The admission of *McMorris* evidence implicates the exercise of sound and reasonable discretion by the circuit court. *Id.* at 152. The evidence should be probative of the defendant's beliefs in relation to her defense. If the court determines that the evidence is relevant, the court should admit it as it would any other relevant evidence, excluding it only if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03.

F. Application to this Case

¶ 130. To determine whether the circuit court properly denied Debra Head's motion to admit *McMorris* evidence and properly refused to allow Debra to assert self-defense, we must apply the standards we have articulated to the facts of the case. We look first to Debra's offer of proof to determine whether it, along with any evidence introduced during the State's case, sufficiently placed self-defense in issue. In making this determination, we will consider the *McMorris* evidence that Debra offered.

¶ 131. In her offer of proof, Debra testified to her belief that she was in imminent danger and that she used the necessary amount of defensive force to prevent death or great bodily harm.

¶ 132. Debra also testified about Harold's temper. She claimed that he was very short-fused and throughout the 1990s became violent after losing his temper. She stated that during 1997–98, she avoided subjects that would "light his fuse" to "avoid being hit." She further asserted that she was afraid of Harold on the morning of his death because of her history with him.

¶ 133. Debra recounted the story of her daughter's pregnancy leading up to the shooting. Debra claimed that Harold found out about Brenda's pregnancy on Valentine's weekend in 1998 and was "very angry." He stormed into the bedroom and came out with two pistols, one uncased. He stated that "he was gonna go out and look for that little fucker, meaning [Graves]," and that he "would kill him." Debra claimed that she was concerned for her safety as well as that of her daughters and Graves. After this incident, Debra was "on egg shells" not knowing when Harold was going to

254

"explode." Debra asserted that she was afraid of Harold because he was bigger than she was and because she knew of his ability to hurt people.

¶ 134. Finally, she testified in detail about the shooting. She claimed that she awakened Harold after their daughters had left for school. They began to talk about financial matters and then about their daughter's pregnancy. When they began discussing Graves, Harold was "pissed off." He accused her of "instigat[ing] this whole thing as far as covering up for Brenda being pregnant. And not teaching her how not to get pregnant." She urged Harold to give Graves a chance, and Harold said "[f]uck that. It's been all your fault ever since. Your fault Brenda got pregnant. It's your fault that this all happened. Fuck Chad and fuck you, too. I'm sick of it. Maybe I should just take—get—take care of you guys and get on with my life."

¶ 135. Debra contended that she took his statement as a threat, that "he was gonna kill me . . . whenever he had the chance at that time." She stated that his comments put her "in the same category" as Graves. Debra claimed that Harold made a move by throwing the covers aside, so she reached down and got the gun from the floor at the side of the bed. She raised the gun and pointed it at Harold, and he "made like he was going to sit up," and then he moved his leg out from under the covers. "He made that move to sit up and come towards me and that's when I pulled the trigger."

¶ 136. Debra testified that she thought Harold was going to "try to get the gun away from me and kill me." She felt threatened because she thought Harold was "coming after" her, even though she had the gun, and was "afraid he would take the gun away" and shoot her. Debra claimed that she shot Harold a second time

because after the first shot, he "made a move where his upper torso was like he was getting up."

¶ 137. Virtually all this evidence is part of the *trial* record. The other specific incidents proffered by Debra—Harold's threats to kill Debra if she filed for divorce, Harold's throwing Debra against the couch and injuring her back, Harold's chasing Debra into the bedroom and breaking the bed frame, Harold's hurling the wrench, Harold's twisting Debra's arms and breasts, Harold's threats to his supervisor, Harold's road rage, Harold's assaults on a neighbor, Harold's retaliation against a little boy who cursed at him—tend to illuminate the defendant's state of mind and her beliefs, reasonable or unreasonable, at the moment of the shooting.

¶ 138. The totality of the defendant's proffer was clearly sufficient to raise the issue of imperfect self-defense for the jury, requiring the court to admit at least some of the character evidence and some of the *McMorris* evidence of specific acts of violence by Harold towards Debra and others. The admitted evidence alone was sufficient to require the submission of a jury instruction on unnecessary defensive force. The court's erroneous decisions excluding all this self-defense evidence did not constitute harmless error. They went beyond harmless error to impair fundamentally the defendant's ability to present a defense. Consequently, we cannot say that it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.

¶ 139. The circuit court itself, when assessing Debra's offer of proof, stated: "Subjectively she's met whatever she would need to meet, but I don't believe that she's met the objective half of the equation."

¶ 140. Inasmuch as imperfect self-defense requires only actual beliefs, even if they are unreasonable, the court's own statements require reversal of the conviction. The court erroneously exercised its discretion based on an incorrect statement of the law as set forth in this opinion.

¶ 141. We think the defendant's version of events and her offer of proof also required the admission of evidence, including *McMorris* evidence, to support a perfect self-defense theory. We make no judgment whether the court should have given an instruction on perfect self-defense, because we have deliberately painted a one-sided picture of the facts and not described the state's expert testimony or the inconsistencies in the defendant's story. We defer to the circuit court on remand to apply the principles of this opinion to requests for jury instructions.

¶ 142. Because the circuit court did not correctly apply the law to the admission of trial evidence to support the two defense theories of self-defense as well as the submission of her requested jury instruction on unnecessary defensive force, we reverse the decision of the court of appeals which affirmed the defendant's conviction of first-degree intentional homicide, and remand the case to the circuit court.

G. Jury Instructions

¶ 143. Finally, we turn to the issue of jury instructions. The circuit court in this case denied Debra Head's request for submission of Wis JI—Criminal 1014, "First Degree Intentional Homicide: Self-Defense: Second De-

gree Intentional Homicide—§ 940.01(2)(b); § 940.05." The court stated that it had ruled on the self-defense issue throughout the trial, and it "[did not] think there's a sufficient factual basis to instruct on this self-defense pursuant to 1014 or any other self-defense theory." ·

¶ 144. It is clear that the circuit court declined to instruct the jury on self-defense because it had already determined that Debra Head had not presented evidence sufficient to place self-defense in issue. That determination was erroneous because Debra's offer of proof contained sufficient evidence to place self-defense in issue. Because of its decision not to allow Debra to assert self-defense or to present evidence supporting self-defense, the court could not properly instruct the jury as to second-degree intentional homicide (unnecessary defensive force) or self-defense. The court instructed the jury only as to first-degree intentional homicide, Wis JI—Criminal 1010, not second-degree intentional homicide, first-degree reckless homicide, or self-defense.[16] The jury was left with only two options—convict Debra Head of first-degree intentional homicide or find her not guilty of any offense without openly considering self-defense. .

¶ 145. Although we conclude that Debra Head was entitled to a jury instruction on second-degree intentional homicide, we note that Wis JI—Criminal 1014 "First Degree Intentional Homicide: Self Defense: Second Degree Intentional Homicide.—§ 940.01(2)(b); § 940.05," does not accurately reflect the law of homi-

---

[16] On appeal, Debra does not assert that the circuit court's decision not to instruct on first-degree reckless homicide was erroneous.

cide and self-defense as set forth in this opinion. Instruction Wis JI—Criminal 1014 provides in relevant part:

> The Criminal Code of Wisconsin provides that a person is privileged to intentionally use force against another for the purpose of preventing or terminating what [she] reasonably believes to be an unlawful interference with [her] person by such other person. However, [she] may intentionally use only such force as [she] reasonably believes is necessary to prevent or terminate the interference. [She] may not intentionally use force which is intended or likely to cause death unless [she] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to [herself].

> As applied to this case, the effect of the law of self-defense is that if the defendant reasonably believed that [she] was preventing or terminating an unlawful interference with [her] person and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to [herself], the defendant is not guilty of either first or second degree intentional homicide.

> If the defendant caused the death of *(name of victim)* with the intent to kill, reasonably believed that [she] was preventing or terminating an unlawful interference with [her] person, and actually but unreasonably believed the force used was necessary to prevent imminent death or great bodily harm to [herself], the defendant is guilty of second degree intentional homicide.

> If the defendant caused the death of *(name of victim)* with the intent to kill and did not reasonably believe that [she] was preventing or terminating an unlawful interference with [her] person or did not actually believe the force used was necessary to prevent

259

imminent death or great bodily harm to [herself], the defendant is guilty of first degree intentional homicide.

Wis JI—Criminal 1014.

¶ 146. Wis JI—Criminal 1014 is inconsistent with our interpretation of Wis. Stat. §§ 940.01 and 940.05, and our determination that no threshold determination of a *reasonable* belief in an unlawful interference is required to mitigate first-degree intentional homicide based on the use of unnecessary defensive force. The jury instruction requires amendment. We therefore request that the Wisconsin Criminal Jury Instructions Committee revisit Wis JI—Criminal 1014.

¶ 147. We note in making this request that the 1989 and 1991 versions of Wis JI—Criminal 1014 "reflected the [Criminal Jury Instruction] Committee's conclusion that any actual, that is, subjectively held, belief in the need to act in self-defense mitigated an intentional homicide to second degree. The Committee had concluded that this was true whether or not the belief is reasonable." Comment 12 to Wis. JI—Criminal 1014. Comment 12 further notes that:

> The Committee has revised the instructions to reflect the *Camacho* threshold requirement by adding the following phrase or its equivalent where needed in the first degree intentional homicide instructions: "that the defendant reasonably believed that he was preventing or terminating an unlawful interference with his person." Because the instructions are drafted to emphasize what the state must prove to justify a finding of guilt, the addition of this "threshold" requirement in effect gives the state another option in meeting its burden to prove that the defendant was not acting under the mitigating circumstances referred to as imperfect self-defense. The state may disprove the miti-

gation by showing that the defendant did *not* "reasonably believe that he was preventing or terminating an unlawful interference with his person."

*Id.* We believe that the versions of Wis JI—Criminal 1014 in place prior to the revisions reflecting the *Camacho* decision may accurately reflect the law, as we have explained it in this case. However, it is not the supreme court's role to draft jury instructions. *Nommensen v. Am. Cont'l Ins.*, 2001 WI 112, ¶ 40, 246 Wis. 2d 132, 629 N.W.2d 301. We therefore request that the Wisconsin Criminal Jury Instructions Committee revisit and amend Wis JI—Criminal 1014 in accordance with this opinion.

## IV. CONCLUSION

¶ 148. We hold that a claim of imperfect self-defense, which mitigates first-degree intentional homicide to second-degree intentional homicide, does not require a showing that a person who used unnecessary defensive force was acting with a *reasonable* belief of an unlawful interference with her person. We conclude that Debra Head's offer of proof established a sufficient factual basis for both perfect and imperfect self-defense. She was entitled at trial to submit some evidence of Harold's violent character and past acts of violence to support her self-defense theory. She should have been given an instruction on unnecessary defensive force. We therefore conclude that Debra Head is entitled to a new trial. Accordingly, we reverse the decision of the court of appeals, and remand this case to the circuit court.

¶ 149. We also conclude that Wis JI—Criminal 1014, the jury instruction involving the mitigation of first-degree intentional homicide to second-degree based on unnecessary defensive force, does not accu-

rately reflect the law as set forth in this opinion. We therefore request that the Wisconsin Criminal Jury Instructions Committee revisit and amend Wis JI—Criminal 1014 in accordance with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 150. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I join the majority opinion, but write separately because I disagree with the statement of the harmless error standard set forth in ¶¶ 44 and 138 for the reasons set forth in my dissents in *State v. Harvey,* 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189, and *State v. Tomlinson,* 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367.

¶ 151. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.

¶ 152. JON P. WILCOX, J. *(concurring).* The court today goes much further than it needs to in order to decide this case. I would only find it necessary to assess the circuit court's initial determination to exclude the *McMorris* evidence. Still, because I would find the circuit court's decision in that respect clearly erroneous, I would come to the same result as the majority, and remand the case for a new trial.

¶ 153. The question of whether or not to admit evidence is a decision left to the discretion of the circuit court. *State v. Cardenas-Hernandez,* 219 Wis. 2d 516, 525, 579 N.W.2d 678 (1998). We will sustain a discretionary act of the circuit court if it assessed the relevant facts, applied the proper standard of law, and reached a reasonable conclusion based on the facts and the law. *Lane v. Sharp Packaging Sys.,* 2002 WI 28, ¶ 19, 251 Wis. 2d 68, 640 N.W.2d 788. Whether the circuit court

used the proper legal standard, however, is a question of law we review independently of the circuit court, benefiting from its analysis. *Id.*

¶ 154. In this case, I would conclude that the circuit court erred in its application of the legal standard of whether or not to allow Debra Head to present *McMorris* evidence. As the majority notes, the State has conceded the point that *McMorris* evidence may be used by a defendant to establish a factual basis to support a self-defense claim. Majority op. at ¶ 121. I agree with this concession. Under Wis. Stat. § 901.04(1) (1997–98),[1]

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge . . . . In making the determination the judge is bound by the rules of evidence only with respect to privileges and as provided in s. 901.05.[2]

Thus, in making an admissibility determination, the judge is not limited to evidence that would be admissible at trial. In this sense, the present case is not unlike the situation in *Bourjaily v. United States,* 483 U.S. 171 (1987), where the United States Supreme Court ruled that, when deciding the admissibility of hearsay evidence as a statement of a co-conspirator, the trial court, when making the preliminary finding of the existence of a conspiracy, can consider the hearsay statements themselves.

¶ 155. Here, the court did not properly consider the rule of Wis. Stat. § 901.04(1) when making its

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version.

[2] Wis. Stat. § 901.05 governs the admissibility of certain medical test results.

admissibility determination. For reasons similar to those we articulated in *State v. Felton,* 110 Wis. 2d 485, 509–10, 329 N.W.2d 161 (1983), and *State v. Hoyt,* 21 Wis. 2d 284, 301–03, 128 N.W.2d 645 (1964), Debra's offer of proof about her husband's past acts does inform the court's decision of whether the threshold standard for at least imperfect self-defense is met. *See* Wis. Stat. § 940.01(2)(b). However, the court in this case expressly limited its consideration to the facts contemporaneous to the shooting, rather than consider all relevant, non-privileged evidence as required by the statute. As a result of this limitation, Debra was not allowed to present *McMorris* evidence at trial. *See* majority op. at ¶¶ 48–49. This explicit failure to consider the other evidence was a misapplication of the proper standard of law, and the circuit court's decision to exclude the *McMorris* evidence from trial was, therefore, clearly erroneous. Furthermore, the error was clearly prejudicial to Debra Head.

¶ 156. Because I would find that the circuit court erred in not considering the *McMorris* evidence itself in its determination of whether to allow Debra Head to present a claim of perfect or imperfect self-defense, I would remand the case to the circuit court for a new trial, allowing the introduction of *McMorris* evidence.

¶ 157. Finally, on a separate issue, I briefly note that I agree with the majority's articulation of the harmless error rule. Majority op. at ¶ 44.

¶ 158. For the foregoing reasons, I respectfully concur.

¶ 159. I am authorized to state that Justice N. PATRICK CROOKS joins this opinion.