State of Wisconsin, Plaintiff-Respondent,
v.
Eric Jason Smiley, Defendant-Appellant.
No. 03-2275.
Court of Appeals of Wisconsin.
Opinion Filed: July 30, 2004.
Before Wedemeyer, P.J., Fine and Curley, JJ.
¶1. PER CURIAM.
Eric Smiley appeals the order denying his Wis. Stat. § 974.06 (2001-02) motion.[1] He argues that a newly-discovered crime lab document bearing his name under the heading of "SUSPECTS," which the State failed to provide in a discovery request, entitles him to a new trial because it proves that he was a suspect at the time he gave the police an un-Mirandized statement.[2] Additionally, he argues that he is also entitled to a new trial because the second-degree intentional homicide imperfect self-defense jury instruction that was read to the jury was a misstatement of the law. Because his arguments are unavailing, we affirm.

I. Background.
¶2. In 1997, Smiley lived in a house in Milwaukee with his sister. In the spring of 1997, his sister's boyfriend, Christopher Garrett, the victim, moved in. Smiley claimed he purchased a handgun for protection after the house had been burglarized twice. Several months after Garrett moved in, some of Smiley's property began missing, including his handgun. After the disappearance of the gun, Smiley purchased another gun to replace it. He suspected Garrett was the thief.
¶3. On June 5, 1997, Smiley went into his sister's room to borrow a cigarette and noticed a handgun sticking out from between the mattresses. He pulled it out and discovered that it was his stolen gun and it was fully loaded.
¶4. Believing that his suspicions about Garrett had been confirmed, Smiley took the gun and put it on a table in the living room. He confronted Garrett, the only other person in the house, with the gun and asked him where other stolen items could be located. A heated exchange began, which led to fisticuffs. During the fight, Garrett, who weighed 260 pounds, put Smiley in a bear hug and squeezed him. According to one of Smiley's statements to the police, he then reached into his waistband where he had placed his new gun and shot Garrett in the leg. Garrett then lunged for the gun in Smiley's hand and Smiley shot him again. When Garrett grabbed the stolen gun, Smiley fired two additional shots, killing Garrett.
¶5. After he realized that Garrett was dead, Smiley attempted to make Garrett's death look like it occurred during an attempted burglary. He then took the guns and left. Smiley's sister later discovered the body and called the police. During the course of the police investigation, the police indicated that they wished to speak to Smiley. Upon hearing of the police's interest in speaking to him, Smiley called the police. When the police arrived, they arrested him for an outstanding municipal warrant. Accordingly, Smiley was taken to headquarters and interviewed.
¶6. During this initial round of interviews, the police told Smiley they wanted to speak to him about Garrett's death, but told him he was not a suspect. Smiley denied any part in the homicide and claimed he had not touched a gun since his arrest in 1991. During the interview, the police noticed that Smiley was limping. Later, other questions were directed to Smiley regarding the abrasion on his head and what caused the disheveled and bloody condition of his clothing. Eventually, the police asked Smiley for his boots and jacket. Shortly thereafter, he was arrested for Garrett's murder. This occurred about four hours after the interview began.
¶7. Smiley was not interviewed again until another four hours passed, at which time he was read his Miranda rights for the first time. During this next interview, Smiley confessed to killing Garrett. As a result of his confession, the police located the murder weapon, another gun and some marijuana.
¶8. Smiley was charged with first-degree intentional homicide while armed. He filed several motions, including a motion seeking to have his earlier false statement to the police suppressed. The trial court denied that motion.
¶9. A jury trial was held. Smiley's strategy at trial was that he acted in self-defense; thus, he sought to be completely exonerated of any crimes. At the conclusion of the trial, the court held a jury instruction conference. The State, over Smiley's objection, was successful in requesting that the jury also be instructed on second-degree intentional homicide-imperfect self-defense. Smiley objected to this jury instruction, but not because it was a misstatement of the law. Smiley's attorney claimed surprise, stating that he had already prepared his closing argument believing there would be no lesser-included offenses, and he argued that no testimony supported the second-degree intentional homicide instruction.
¶10. During deliberations, the jury asked the court to explain the difference between first- and second-degree homicide. In response, the trial court read Wis JI-Criminal 1014 to the jury. The jury returned a verdict finding Smiley guilty of first-degree intentional homicide while armed. At sentencing, the trial court sentenced him to life in prison with parole eligibility in forty years.
¶11. Smiley filed a postconviction motion seeking a new trial. This motion was denied and his conviction was affirmed in his direct appeal. See State v. Smiley, No. 01-0335-CR, unpublished slip op. (WI App Jan. 8, 2002). In June 2003, Smiley filed a Wis. Stat. § 974.06 motion. In his motion, Smiley claimed that newly-discovered evidence revealed that he had been a suspect from the beginning of the investigation and, consequently, that the trial court erred in denying his motion to suppress his pre-Miranda statements to police. He also claimed that the State failed to provide this document in discovery. In Smiley's view, both errors required a new trial. Further, he argued that the self-defense instruction given to the jury misstated the law. This motion was also denied and Smiley now appeals.

II. Analysis.
¶12. Smiley submits that a newly discovered crime lab document dated June 6, 1997, listed him as a suspect. As a result, Smiley argues that his first statement, given to the police when he asserts he was actually a suspect in the homicide, was inadmissible because he was never read his Miranda rights before he gave the statement. Smiley has also alleged a discovery violation for the State's failure to turn over the fingerprint document, which, he asserts, also establishes his right to a new trial. We are unpersuaded by both arguments.[3]
¶13. A new trial will be granted based upon newly discovered evidence if the defendant establishes by clear and convincing evidence that:
(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking to discover it; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative to the testimony introduced at trial; and (5) it is reasonably probable that, with the evidence, a different result would be reached at a new trial.
State v. Carnemolla, 229 Wis. 2d 648, 656, 600 N.W.2d 236 (Ct. App. 1999).
¶14. When reviewing a trial court's decision concerning a motion for a new trial based upon newly discovered evidence, we look to see whether the trial court properly exercised its discretion. State v. Brunton, 203 Wis. 2d 195, 201-02, 552 N.W.2d 452 (Ct. App. 1996)." However, whether due process requires a new trial because of newly-discovered evidence is a constitutional question subject to independent review[.]" State v. Kimpel, 153 Wis. 2d 697, 702, 451 N.W.2d 790 (Ct. App. 1989).
¶15. With respect to Smiley's discovery violation claim, under Brady v. Maryland, 373 U.S. 83 (1963)," suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. To establish a Brady violation, a defendant must show that the evidence was "favorable to the accused," was "suppressed by the State," and "prejudice" ensued. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999). For Brady purposes, the third component is satisfied only if the evidence is "material"-"only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). Furthermore, "[a] `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. Thus, if a discovery violation is established in this manner, it is a violation of due process, see Brady, 373 U.S. at 87, and a question of constitutional law subject to independent review, see State v. Avery, 213 Wis. 2d 228, 234, 570 N.W.2d 573 (Ct. App. 1997).
¶16. Smiley has met the first four prongs of the test set forth in Carnemolla. He has presented evidence that strongly supports his contention that the crime lab document was newly discovered after his trial and appeal had been concluded. Further, Smiley was not negligent in obtaining the report, the document is arguably material to an issue in the case, and it is not merely cumulative to other testimony or evidence. However, Smiley has failed to meet the fifth criterion for a new trial; i.e., that it is reasonably probable a different result would be reached at a new trial with the new evidence. For the same basic reason, Smiley has not met the Brady requirement that the evidence be "material."
¶17. The fingerprint document in question is a standardized form entitled "LATENT FINGERPRINT CASE," with blank spaces to be completed. It is dated June 6, 1997, and bears the name "T. Kowalske" as the fingerprint technician. It reflects that the technician was dispatched to the scene and examined a stereo and a window frame for fingerprints. Listed after the preprinted words "NOTES OF OFFENSE" is the following description: "apparent burglary to victims [sic] residence; victim found in living room area with 4 gun shot wounds, possibly surprised burglar." Under the preprinted word "SUSPECTS," the full names of Smiley and the victim, Garrett, are listed, along with their descriptions, dates of birth and bureau of identification numbers.
¶18. At trial, the trial court concluded, and was later affirmed by this court, that Smiley's first statement, given without the benefit of Miranda warnings, was admissible because Smiley, while in custody, was not being interrogated. Thus, the newly discovered evidence must establish that Smiley was actually being "interrogated" in order to meet the test set forth in Carnemolla-that it is reasonably probable that a different result would be reached at a new trial. This must also be established under Brady as it requires a showing that the evidence is "material." Smiley has failed to do so.
¶19. As noted, the critical issue is whether the crime lab document calls into question whether he was actually being "interrogated" when he gave his first statement to the police. "Interrogation," for Miranda purposes, means, in addition to express questioning," words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" from the person in custody. Rhode Island v. Innis, 446 U.S. 291, 302 (1980) (emphasis in original; footnote omitted)." The test is whether an objective observer could foresee that the officer's conduct or words would elicit an incriminating response." State v. Cunningham, 144 Wis. 2d 272, 278, 423 N.W.2d 862 (1988). "[T]he focus of the Innis test is `primarily upon the perceptions of the suspect." Id. at 279 (citation omitted). That is, the police conduct "must be viewed from the suspect's perspective to determine whether such conduct was reasonably likely to elicit a response." Id. at 280. However, "[t]he police cannot be held accountable for the unforeseeable results of their words or actions." Id. at 279-80.
¶20. The trial court heard testimony from the police that they interviewed Smiley because he resided with the victim and they believed he could offer helpful information to the investigation. The police testified he was not a suspect at the time of the first interview. The crime lab form does not call into question the trial court's determination that Smiley was being interviewed, not interrogated, at the time of his first statement. A review of the entire document sheds light on why Smiley's and Garrett's names were listed under the preprinted word" SUSPECTS." The document listed the crime as an "apparent burglary." Smiley's and Garrett's were listed on the preprinted form presumably because, as residents of the house, the police expected to find their fingerprints and, thus, they would be eliminated as possible intruders if their fingerprints matched any found at the scene.
¶21. Common sense dictates the same conclusion because if Smiley's theory-that being listed under the heading" SUSPECT" automatically renders him a suspect in the investigation-is correct, then one would also have to believe that the victim was a "suspect" in the investigation of his own murder, as his name was listed too. Thus, Smiley's claim based upon the fingerprint form lacks merit and, as a result, he has shown neither a reasonable probability of a different result at trial nor that the evidence is material.
¶22. Next, Smiley argues that the reading of the pattern jury instruction, Wis JI-Criminal 1014, at his trial constituted an error requiring a new trial. Specifically, he notes that the jury instruction entitled FIRST DEGREE INTENTIONAL HOMICIDE: SELF-DEFENSE: SECOND DEGREE INTENTIONAL HOMICIDE-§ 940.01(2)(b); § 940.05, has been changed as a result of the holding in State v. Head, 2002 WI 99, 255 Wis. 2d 194, 648 N.W.2d 413. In pertinent part, the version of the instruction read to the jury stated:
As applied to this case, the effect of the law of self-defense is that if the defendant reasonably believed that he was preventing or terminating an unlawful interference with his person and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to himself, the defendant is not guilty of either first or second degree intentional homicide.
If the defendant caused the death of Christopher Garret [sic] with the intent to kill, reasonably believed that he was preventing or terminating an unlawful interference with his person, and actually, but unreasonably, believed the force used was necessary to prevent imminent death or great bodily harm to himself, the defendant is guilty of second degree intentional homicide.
If the defendant caused the death of Christopher Garret [sic] with the intent to kill and did not reasonably believe that he was preventing or terminating an unlawful interference with his person or did not actually believe the force used was necessary to prevent imminent death or great bodily harm to himself, the defendant is guilty of first degree intentional homicide.
(Emphasis added.) Head subsequently modified the pattern jury instruction. The previous language instructed the jury that, in evaluating the evidence under a claim of imperfect self-defense, they were to determine whether the defendant had a reasonable belief that he or she was in imminent danger of death or great bodily harm. Head replaced this language with language that made clear that the defendant need only have an actual belief-it need not be reasonable-in order to fall within the scope of imperfect self-defense. Head explains:
[A] defendant seeking a jury instruction on unnecessary defensive force (imperfect self-defense) to a charge of first-degree intentional homicide is not required to satisfy an objective threshold showing that [the party] was acting under a reasonable belief that [the party] was in imminent danger of death or great bodily harm or that the force [he or] she used was necessary to defend [himself or] herself. Rather, the defendant must show some evidence that [he or] she actually believed that [he or] she was in imminent danger of death or great bodily harm and actually believed that the force [he or] she used was necessary to defend [himself or] herself.
Id., ¶5 (emphasis in original).
¶23. Smiley contends that the version of the instruction read to the jury unlawfully relieved the State from proving that either he did not actually believe he was preventing or terminating an unlawful interference with the victim or that he did not actually believe the force he used was necessary to prevent imminent death or great bodily harm. Smiley submits that, as a consequence, he is entitled to a new trial. We disagree.
¶24. Smiley's argument fails for two reasons. First, while Smiley objected to Wis JI-Criminal 1014 being read to the jury, he never objected to the jury instruction on the ground that it improperly stated the law. Second, State v. Lo, 2003 WI 107, 264 Wis. 2d 1, 665 N.W.2d 756, is dispositive as it established that the holding in Head is not retroactive.
¶25. At the jury instruction conference, Smiley objected to the reading of Wis JI-Criminal 1014, but he did so on other grounds. His attorney argued unsuccessfully that he was taken by surprise by the State's request for the instruction, and that he had already prepared his closing argument believing that no lesser-included offenses would be submitted to the jury. His attorney also argued that no evidence supported the giving of the instruction. No objection was ever raised, however, on the ground that the instruction improperly stated the law. To be sufficiently specific to preserve the right to appeal, an objection must reasonably advise the court of the basis for the objection. See State v. Tutlewski, 231 Wis. 2d 379, 384, 605 N.W.2d 561 (Ct. App. 1999). Inasmuch as this court lacks authority to review unobjected-to jury instructions, see State v. Schumacher, 144 Wis. 2d 388, 409-10, 424 N.W.2d 672 (1988), Smiley has failed to preserve this argument.
¶26. Moreover, the identical issue raised here was decided in Lo. There, the supreme court opined that the Head holding does not apply retroactively to cases on collateral review.[4]Lo, 264 Wis. 2d 1, ¶5.
¶27. In Lo, the supreme court grappled with the question of whether the wording change of Wis JI-Criminal 1014, as required by Head, should be applied retroactively. Like the circumstances here, the challenge to the jury instruction in Lo came after the direct appeal was decided. Thus, the court was obligated to decide whether the new rule should be applied retroactively in collateral proceedings. In deciding the issue against Lo, the court applied the tests set out in Teague v. Lane, 489 U.S. 288 (1989):
"First, a new rule should be applied retroactively if it places `certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" "Second, a new rule should be applied retroactively if it requires the observance of `those procedures that are implicit in the concept of ordered liberty.'"
Lo, 264 Wis. 2d 1, ¶63 (citations omitted).
¶28. The Lo court concluded that under neither test was the rule to be applied retroactively:
The new rule announced in Head does not satisfy either of the Teague tests for retroactivity in a collateral proceeding. The first test does not apply because Lo's conduct was not decriminalized. The State's proof on a claim of unnecessary defense force was modified. No reasonable argument can be made that the old burden-an objective threshold of reasonableness-was or is beyond the power of the criminal lawmaking authority to proscribe.
The second test does not apply because substituting the words "actually believe that he was preventing or terminating a lawful interference with his person," for "reasonably believe that he was preventing or terminating an unlawful interference with is person" is not a watershed rule of criminal procedure, implicating fundamental fairness and the concept of ordered liberty.
Id., ¶¶70-71. As a result, Smiley is not entitled to a new trial on the basis of the previously flawed Wis JI-Criminal 1014.
¶29. For the reasons stated, the trial court's order denying the motion is affirmed.
By the Court.  Order affirmed.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] See Miranda v. Arizona, 384 U.S. 436 (1966).
[3] The postconviction court, in denying Smiley's motion, determined that the police conducting the interview with Smiley did not know of the fingerprint document. The court also concluded that State v. Escalona-Naranjo, 185 Wis. 2d 168, 517 N.W.2d 157 (1994), prevented Smiley from raising the issue of the improper jury instruction and, in any event, the jury instruction was not susceptible to attack because it was a pattern jury instruction. The State has not relied on the trial court's reasoning, conceding that Escalona-Naranjo probably does not bar Smiley's motion. The State has also not adopted the trial court's theory that a pattern jury instruction is impervious to attack.
[4] While Smiley concedes that Lo is contrary to his position, he argues that it was mistakenly decided. This court is obligated to follow Wisconsin Supreme Court precedent. Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) ("The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case."). Thus, any change in the law must come from the Supreme Court.