**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 23, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2021AP163-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018CF152

**IN COURT OF APPEALS
DISTRICT IV**

---

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

  V.

DANIEL C. LIESKE,

  DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Dane County: JILL KAROFSKY, Judge.  *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Fitzpatrick, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Following a jury trial, Daniel C. Lieske was convicted of first-degree intentional homicide.[1]  On appeal, Lieske argues that the circuit court erred by:  (1) denying Lieske's motion to suppress statements; and (2) ruling that Lieske could not impeach his own witnesses as to their opinion of the victim's character for violence or peacefulness with specific instances of the victim's alleged violent conduct.  For the reasons that follow, we affirm the judgment.

## BACKGROUND

¶2     The criminal complaint alleged as follows.  Lieske lived with his girlfriend, Meichelle Goss, in a duplex next door to Goss's son and daughter.  On January 15, 2018, Goss's son hosted a party at his house with some friends.  Shortly before midnight, Lieske and Goss went next door to break up the party.  Goss and her son drove most of the partygoers home.  Due to cold weather, partygoer Jesse Faber planned to spend the night at Goss's son's house.  Faber went next door with Lieske from Goss's son's house to the duplex that Goss and Lieske shared.  Goss later told law enforcement officers that she believed Faber was going to sleep at her duplex after the party ended.  Lieske said that Faber left their duplex after the party while Goss and her son were driving people home.

¶3     Goss returned home and she saw Lieske pointing a gun at Faber, who was lying on the floor.  After she left the room, she heard a "weapon fired approximately four times" and, when she returned, she saw Faber lying on his side and "moaning," with blood coming from him.

_____

[1] Lieske also pled guilty to one count of hiding a corpse.  That conviction is not being appealed.

2

¶4 In reviewing video surveillance from exterior video cameras in the vicinity of Lieske's duplex, officers saw Faber enter Lieske's unit but did not see Faber or any vehicle leave the property during the relevant time period. On the video, officers saw Lieske walking out of his doorway toward the parking lot early on the morning after the party. Lieske was slowly walking backward, dragging a dark object about five to eight feet long. He placed the object into a dark colored minivan.

¶5 When confronted with inconsistencies in her initial version of events, Goss told officers that she saw Lieske shoot Faber, then Lieske told her that Faber was "gone," and she declined Lieske's request to help remove Faber's body from their duplex. She further told police that the next morning she noticed a 5x7 rug missing from the duplex. Goss said that after Lieske shot Faber, she heard what sounded like rustling plastic and duct tape, and she believed that Lieske had secured Faber's body in plastic, rolled it up in the rug, and then put the body in a work van. Goss said that she followed behind while Lieske drove the van to a farm outbuilding. She said that Lieske took Faber's body to a storage shed in Rio. Police obtained a search warrant and found Faber's body in Lieske's storage unit, wrapped in plastic and the rug. An autopsy confirmed that Faber died from gunshot wounds to the head, torso, and left upper extremity.

¶6 The State charged Lieske with first-degree intentional homicide and one count of hiding a corpse. By counsel, Lieske moved to suppress incriminating statements he made to law enforcement while in custody at the Marshall Police Department and, later, at the Dane County Jail. Following a hearing, the circuit court suppressed the statements that Lieske made at the Marshall Police Department, but declined to suppress Lieske's statements to officers at the Dane County Jail, which were made while the officers executed a search warrant of

Lieske's body. As to the latter, the court ruled that Lieske's statements were not the result of an interrogation and, therefore, did not run afoul of the requirements of *Miranda*.[2]

¶7 Lieske proceeded to jury trial on the homicide charge. Relying on WIS. STAT. §§ 904.04(1)(b) and 904.05(2) (2021-22),[3] Lieske renewed an earlier request seeking permission to impeach his own witnesses as to their opinion of Faber's character for violence or peacefulness with specific instances of Faber's conduct. The circuit court denied the motion. Lieske was convicted, and this appeal follows.

## DISCUSSION

*A. Any error in denying Lieske's suppression motion was harmless.*

¶8 Lieske argues that the circuit court erred in denying his motion to suppress inculpatory statements he made to Detectives Cheryl Patty and David Hall at the Dane County Jail, while they were searching his person pursuant to a warrant, before they read him his *Miranda* rights. He asserts that the detectives knew he was under enormous emotional stress and took advantage of this by making comments designed to elicit an incriminating response.

¶9 To safeguard a person's constitutional right against self-incrimination, law enforcement must provide *Miranda* warnings before subjecting that person to a custodial interrogation or its functional equivalent. *State v.*

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

*Harris*, 2017 WI 31, ¶¶14-15, 374 Wis. 2d 271, 892 N.W.2d 663. The "functional equivalent" of a police interrogation that is subject to Fifth Amendment requirements under *Miranda* "includes 'any words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Harris*, 374 Wis. 2d 271, ¶19 (quoted source omitted). Whether an officer's words or actions constitute the functional equivalent of an interrogation turns on an objective foreseeability test: if an objective observer could foresee that the officer's conduct or words would elicit an incriminating response and "could reasonably have had the force of a question on the suspect, then the conduct or words would constitute interrogation." *State v. Cunningham*, 144 Wis. 2d 272, ¶22, 423 N.W.2d 862 (1988).

¶10 The following facts are taken from Lieske's suppression hearing.

¶11 Detective Patty testified as follows. After Lieske was arrested and in custody at the Dane County Jail, Detectives Patty and Hall executed a search warrant of Lieske's body. They read the warrant to him, explained that the warrant was "to recover physical evidence" by taking "photographs [of] him" to document his physical condition and whether "there was any injury" to him, and told him several times that they "were not there to reinitiate any kind of conversation or any kind of questioning." They did not read Lieske his *Miranda* rights because they did not intend to ask him any questions. Although they did not question Lieske, he "continued to make statements about what had occurred"; thus, the detectives "activated the recording" and reiterated that they "were there for the search warrant and that it was his choice to talk to [them] or not."

¶12    The following exchange took place between Lieske and the detectives, quoted by the circuit court in its ruling:

> Detective Patty:  And I think I had over, I overheard you letting him know that we don't reinitiate conversation, um, I just wanted, that ... one of [the] things I wanted to talk [to] you about is that, you know, you're free to talk to us.  It's your decision to talk to us.  Um, we have a search warrant to execute right now, that's why we're back in contact with you right now.
>
> Mr. Lieske:  Search warrant for me?
>
> Detective Patty:  For that.  Just for those items that you [that] you have right there, um, which won't take too long.  But if you … want ... to talk to us, it's your decision.
>
> Mr. Lieske:  Well, I want.  I wanna cooperate with ya okay.
>
> Detective Patty:  Mmhmm.
>
> Mr. Lieske:  I'm trying to hold it together guys, alright. I am struggling … it's ... [a] different ... world for me here. I'm trying ta, I'm trying to grasp all [of] this okay.  I'm having a little bit of difficulty with that.  It's because it was so surreal what what what, I mean.  It's not like I went out. It's not like I went out and ... then ... and did something bad.  This this happened at my house.  It was the craziest frickin' thing [I have] ever had, that that's happened.  It was crazy.  The guy was nuts.  I mean, okay.  I'll do.  You can read it to me.
>
> [Lieske asks some questions about the photographs that the detectives were taking pursuant to the warrant.]
>
> Detective Hall:  We need to document that stuff ya know.
>
> Mr. Lieske:  So right now it's all against me no matter what correct? Pretty much.
>
> Detective Hall:  Our job is to gather facts so we can ... get a picture of everything that happened.
>
> Mr. Lieske:  But not to help me.
>
> Detective Hall:  Ya know.
>
> Mr. Lieske:  Right.

Detective Hall: Well our job is to determine the truth. It's not to ….

Mr. Lieske: But you don't know the truth.

Detective Patty: The more information we have the more complete picture we have of the facts of what happened. So ya know that's why we're trying to ... document what's presented to us. [R.537:9-10; A-App at 5]

Mr. Lieske: [makes incriminating statements]

¶¶13 The parties agree that Lieske was in custody for purposes of *Miranda* while the detectives searched him at the Dane County Jail. They also agree that the detectives did not formally interrogate or expressly question Lieske during the search of his person. However, the parties dispute whether the detectives' statements made during the search of Lieske's person constituted the functional equivalent of an interrogation such that Lieske's statements should have been suppressed.

¶14 In support of its position, the State emphasizes the circuit court's findings and how those findings support a legal conclusion that the detectives' statements were not the functional equivalent of an interrogation. Lieske points to the detectives' knowledge that he was scared and anxious, along with statements they made that had nothing to do with executing a search warrant and that, according to Lieske, were designed to elicit an incriminating response.

¶15 We need not decide whether the detectives' statements while searching Lieske at the Dane County Jail were the functional equivalent of interrogation because we conclude that any error in denying Lieske's suppression motion was harmless.

¶16 If a statement that should have been suppressed has been erroneously admitted at trial, that admission is subject to a harmless error analysis.

*State v. Moore*, 2015 WI 54, ¶92, 363 Wis. 2d 376, 864 N.W.2d 827. An error is harmless if "it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *State v. Harvey*, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted). "[T]he burden of proof is on the beneficiary of the error," here the State, to show that the error was harmless. *State v. Dyess*, 124 Wis. 2d 525, 544 n.11, 370 N.W.2d 222 (1985).

¶17     First, and of primary import, the State at trial in its case-in-chief did not introduce or in any way rely on Lieske's incriminating statements to the detectives during their execution of the search warrant.[4] At trial, Detectives Patty and Hall both testified briefly about the execution of the search warrant, but only to establish that the pictures of Lieske did not show any injuries and that Lieske had denied being injured; they did not testify about Lieske's incriminating statements. Because Lieske was convicted *without* the incriminating statements he complains of, it stands to reason that even if the circuit court had granted the suppression motion, Lieske still would have been convicted.

¶18     Second, the State introduced a great deal of evidence at trial in support of Lieske's conviction for first-degree intentional homicide. *See, e.g.*, *State v. Nelson*, 2014 WI 70, ¶51, 355 Wis. 2d 722, 849 N.W.2d 317 (circuit court order violating defendant's right to testify was harmless error because of "the overwhelming strength of the prosecution's case"). The State's evidence included all of the physical evidence, including Faber's body being wrapped in Lieske's rug and found in Lieske's storage unit, and supported by Goss's eyewitness testimony

---

[4] At the suppression hearing, the prosecutor said that the State did not intend to use any of Lieske's custodial statements in its case-in-chief.

8

that she saw the confrontation between Lieske and Faber, heard the multiple gun shots, and assisted Lieske in hiding Faber's body. Trial testimony established that Lieske confessed to Goss's mother that he shot Faber, telling her that he "did something bad," that he acted in "self-defense," and that he had been "threatened" and "attacked." Detectives Patty and Hall testified at trial about their observations that Lieske had no injuries, that Lieske "denied injuries," and that the photographs taken of Lieske "to document his physical condition" and whether he had "any injuries or marks" did not show any injuries. This evidence undermined the theory of self-defense.

¶19    Lieske asserts that the circuit court's decision denying suppression interfered with his right to testify. More specifically, Lieske argues that any error in denying his suppression motion was not harmless because it prevented him from taking the stand on his own behalf. We agree with the State that this argument is without merit. Even if the court had granted his suppression motion as to the Dane County Jail statements, once Lieske testified, the State could have introduced the suppressed, incriminating statements for impeachment. *See **State v. Mendoza***, 96 Wis. 2d 106, 118-19, 291 N.W.2d 478 (1980) (suppressed statement may not be used in case-in-chief but may be used should defendant testify to the contrary for impeachment). Thus, the denial of his motion to suppress did not interfere with Lieske's right to testify because it had no significant effect on the ability of the prosecution to use these statements if he testified.

¶20    In sum, the State proved beyond a reasonable doubt that Lieske committed first-degree intentional homicide through admissible evidence at trial, not by using his incriminating statements at the Dane County Jail, which the State did not introduce at trial and which, even if they had been suppressed, could have

been used to impeach Lieske. Accordingly, any error in denying Lieske's motion to suppress was harmless.

*B. The circuit court properly exercised its discretion when it ruled that the proffered specific acts of alleged violent conduct committed by Faber but unknown to Lieske were inadmissible.*

¶21 We review a circuit court decision to admit or exclude evidence for an erroneous exercise of discretion, upholding such a ruling unless the court failed to apply the proper legal standard or the record lacks reasonable support for the ruling. *State v. Jackson*, 2014 WI 4, ¶43, 352 Wis. 2d 249, 841 N.W.2d 791.

¶22 From the beginning, Lieske's theory of defense was self-defense. As part of pursuing this theory, in a motion in limine, Lieske sought to elicit other-acts evidence regarding acts of Faber from C.I., a witness for the State, about an alleged incident in which C.I. brandished a pistol in front of Faber and Faber quickly became enraged, charged at C.I., and knocked C.I. to the floor. Lieske's motion asserted that the other acts evidence was admissible to demonstrate that "Faber had a peculiar and specific emotional reaction to being in the presence of a firearm."

¶23 In response to the State's motion in limine and at two motion hearings, Lieske clarified that he sought to introduce character evidence about Faber to show that Faber was likely the first aggressor in his interactions with Lieske. Lieske argued that "the statutes allow for some leeway in terms of introducing character of the accused and of the victim as to—as it relates to their reputation for violence and turbulence[.]" Lieske told the circuit court that he intended to ask the other partygoers about Faber's reputation for being violent when intoxicated in order to show that Faber was the first aggressor in his interaction with Lieske that resulted in his death.

10

¶24 The circuit court ruled that, if trial counsel laid the proper foundation, he could ask the State's witnesses about Faber's reputation for violence when drinking. The court added that the State could then impeach these character witnesses with specific acts tending to show that Faber was peaceful. Trial counsel responded, "That's fair."

¶25 Trial counsel then argued that, if Lieske's character witnesses testified that Faber had a reputation for peacefulness, Lieske should be able to impeach the same witnesses with specific acts of violence under WIS. STAT. § 904.05. The circuit court was skeptical, stating that if Lieske's witnesses testified that Faber had a reputation for peacefulness, he could not then impeach his own witnesses with specific acts of violence under § 904.05. The court withheld ruling, stating that it would take the matter under advisement.

¶26 At the next hearing, the circuit court continued ruling on pending pretrial motions, explaining that although the court wanted Lieske to be able to conduct his defense how he pleased, it was "concerned about having a trial within a trial." When it came to Lieske's motion to admit specific instances of Faber's conduct as part of the impeachment of witnesses, the court began its ruling by going through the various statutes regarding the admissibility of character evidence. After noting that Lieske did not seek to admit Faber's alleged violent conduct as other-acts testimony, the court ruled that it would admit reputation and opinion testimony regarding whether Faber was violent when intoxicated. However, citing WIS. STAT. § 904.05(1),[5] the court ruled that whether a witness

---

[5] WISCONSIN STAT. § 904.05(1) states: "(1) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

could be impeached regarding specific instances of conduct by Faber depended on which side called that witness. The court specified that Lieske could impeach the State's witnesses with particular acts of Faber's violent conduct "[o]n cross-examination," but Lieske could not impeach his own witnesses if they testified on direct that Faber had a peaceful character.

¶27 Lieske raised the issue one more time, on the second day of trial. Before opening statements, Lieske made an offer of proof regarding alleged prior acts of violent conduct by Faber. Counsel for Lieske admitted that, at the time of the charged homicide, Lieske himself was personally unaware of any specific instances of Faber's violence, but counsel explained that Lieske sought to introduce this as impeachment evidence in the event that his own witnesses, in answering whether Faber had a reputation for violence, testified that Faber had a peaceful reputation.

¶28 The circuit court reiterated that it would allow Lieske to introduce testimony about Faber's reputation for violence or peacefulness, but ruled that any "specific instances of conduct" by Faber were inadmissible because they were not known to Lieske at the time of the homicide. In so ruling, the court relied on *McMorris v. State*, 58 Wis. 2d 144, 205 N.W.2d 559 (1973). The *McMorris* court explained that in a homicide trial in which self-defense is adequately raised, evidence of "the turbulent and dangerous character or reputation" of the victim is relevant for two distinct purposes: (1) determining whether the defendant or the victim was the aggressor; and (2) judging the reasonableness of the defendant's apprehension of danger when the incident occurred. *Id.* at 149. "Admissibility is not automatic," and *McMorris* evidence "may not be used to support an inference about the victim's actual conduct during the incident." *State v. Head*, 2002 WI 99, ¶128, 255 Wis. 2d 194, 648 N.W.2d 413. *McMorris* evidence is admissible

12

only with respect to the defendant's state of mind, to the extent that it "'bear[s] on the reasonableness of the defendant's apprehension of danger at the time of the incident.'" **Head**, 255 Wis. 2d 194, ¶128, (quoting **McMorris**, 58 Wis. 2d at 149).[6]

¶29    We agree with the State that the circuit court properly exercised its discretion and applied controlling law to allow Lieske to introduce evidence of Faber's reputation for violence, but not evidence of any specific violent acts by Faber that Lieske was not aware of at the time of the crime. Lieske has not provided us with persuasive authority for the proposition that specific violent acts by Faber, of which Lieske was unaware, are admissible under **McMorris** and its progeny. Lieske has similarly not provided us with persuasive authority to support the proposition that the **McMorris** rule does not apply to "impeachment evidence." Lieske points to WIS. STAT. § 904.05(2), which provides, "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of the person's conduct." However, as explained above, our supreme court in **McMorris** and subsequent cases has limited this proof to specific instances known to the defendant at the time of the crime.

¶30    Finally, we reject Lieske's argument that the circuit court's evidentiary ruling relying on the **McMorris** rule interfered with his constitutional

---

[6] Subsequent cases have adhered to **McMorris**'s holding that only specific acts of violence known to the defendant at the time of the incident are relevant and admissible. *See, e.g.*, **State v. Jackson**, 2014 WI 4, ¶82, 352 Wis. 2d 249, 841 N.W.2d 791; **State v. Boykins**, 119 Wis. 2d 272, 350 N.W.2d 710 (Ct. App. 1984). The circuit court discussed all three cases in ruling that Lieske could not ask witnesses about specific acts of Faber's violence if Lieske himself was unaware of the specific acts at the time he shot Faber.

due process right to present a defense. The circuit court allowed Lieske to argue and introduce evidence relevant to Lieske's theory of self-defense, including evidence of Faber's reputation for violence, and it instructed the jury on self-defense. These rulings allowed Lieske to place his claim of self-defense squarely before the jury.

¶31 In sum, the record shows that the circuit court applied controlling law to the facts of record and explained its reasoning to reach a conclusion that a reasonable court could reach. *See McCleary v. State*, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971) (exercise of discretion depends "on facts that are of record … and a conclusion based on a logical rationale founded upon proper legal standards"). Accordingly, Lieske fails to show that the court erroneously exercised its discretion in excluding evidence of specific instances of violent conduct by Faber unknown to Lieske at the time of the crime.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.